UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

————————————————————————X

KEVIN HARRIS,              :
     PLAINTIFF,        :       VERIFIED COMPLAINT FOR DAMAGES
                       :
    vs.                :       CIVIL ACTION NO._____
                       :
KENNY, CAPTAIN;         :
MAJOR, CORRECTIONAL OFFICER;   :
JOHN DOE #1, CORRECTIONAL OFFICER;  :
JOHN DOE #2, CORRECTIONAL OFFICER;  :
JOHN DOE #3, CORRECTIONAL OFFICER;  :
JOHN DOE #4, CORRECTIONAL OFFICER;  :
JOHN DOE #5, CORRECTIONAL OFFICER;  :
JOHN DOE #6, CORRECTIONAL OFFICER;  :
CARCELLA, WARDEN;       :
MALDANADO, DISTRICT ADMINISTRATOR;  :
SCOTT SEMPLE, COMMISSIONER OF   :
CORRECTION,          :
     DEFENDANTS.       :

————————————————————————X

## I. JURISDICTION & VENUE

1. This is a civil action authorized by 42 U.S.C. Section 1983 to redress the deprivation, under color of state law, of rights secured by the Constitution Of The Unit States. The Court has jurisdiction under 28 U.S.C. Section 1331 and 1343 (a)(3). Plaintiff Harris seeks Declaratory Relief pursuant to 28 U.S.C. Section 2201 and 2202.

2. The Bridgeport United States District Court Of Connecticut is an appropriate venue under 28 U.S.C. Section 1391(b)(2) because it is where the events giving rise to this claim occured.

## II. PLAINTIFF

3. Plaintiff KEVIN HARRIS, is and was at all times mentioned herein a Prisoner of the State Of Connecticut in the custody of the Connecticut Department Of Correction ("D.O.C."). He is currently confined in Cheshire Correctional Institution ("Cheshire"), in Cheshire, Connecticut.

## III. DEFENEDANTS

4. Defendant KENNY , is and was at all times mentioned herein held the rank of Captain and was assigned as a Unit Manager in Gardner Correctional Institution ("Gardner"), in Newtown, Connecticut. He is legally responsible for the welfare of all Prisoners, Staff and Operation of those Blocks he is assigned to and the actions of those Staff stationed in those Units.

1

5. Defendant MAJOR, is and was a Correctional Officer ("C/O") of the D.O.C. who, at all times mentioned in this Complaint, held the rank of Prison Guard and assigned to Gardner.

6. Defendant JOHN DOE #1, is and was a C/O of the D.O.C. at all times mentioned in this Complaint, held the rank of Prison Guard and was assigned to Gardner.

7. Defendant JOHN DOE #2, is and was a C/O of the D.O.C. at all times mentioned in this Complaint, held the rank of Prison Guard and was assigned to Gardner.

8. Defendant JOHN DOE #3, is and was a C/O of the D.O.C. at all times mentioned in this Complaint, held the rank of Prison Guard and was assigned to Gardner.

9. Defendant JOHN DOE #4, is and was a C/O of the D.O.C. at all times mentioned in this Complaint, held the rank of Prison Guard and was assigned to Gardner.

10. Defendant JOHN DOE #5, is and was a C/O of the D.O.C. at all times mentioned in this Complaint, held the rank of Prison Guard and was assigned to Gardner.

11. Defendant JOHN DOE #6, is and was a C/O of the D.O.C. at all times mentioned in this Complaint, held the rank of Prison Guard and was assigned to Gardner.

12. Defendant CARCELLA, is and was the Warden at Gardner for the D.O.C. at all times relevant to this Complaint, her resposibilities include, but not limited to, deciding Grievances,responding to request directed to her, and the over all operations of that Prison, and the welfare, health and safety of all Prisoners housed there.

13. Defendant MALDENADO, is and was the District Administrator for the D.O.C. at all times relevant to this Complaint, whose responsibilities include, but not limited to, responding to and disposing of Grievances that are being appealed from decisions made by the Warden at a D.O.C. facility within his District.

14. Defendant SCOTT SEMPLE, is and was the Commissioner of the D.O.C. at all times  relevant in this Complaint, whose tenure the offending policies and practices were instructed and maintained and enforced. Pursuant to Fed.R.Civ.P. 25(d), Defendant Scott Semple is the proper party Defendant.

15. Each Defendant is sued Individually and in their Official Capacity at all times mentioned in this Complaint each Defendant acted under the Color Of State Law.

2

IV. FACTUAL STATEMENT

16. On 8/8/2018 at approximately 9:45am the Plaintiff was taken to Defendant Kenny, Captain's ("Captain Kenny") office to be questioned about why he made no effort to lock up during the Code Blue and just stood around.

17. While in the Captain Kenny's office with Defendant Major, Correctional Officer ("C/O Major"), Captain Kenny had two cans of Chemical Agent in reach of the Plaintiff and made his comment, "Let me move these before you get a stupid idea". The Plaintiff told the Defendants Captain Kenny and C/O Major. "I'm highly allergic to Chemical Agents, I wouldn't touch the stuff". The Defendant Kenny removed the two cans from the front of his desk.

18. The Defendant's Captain kenny and C/O major asked the Plaintiff, "Why you did not lock up right away"? The Defendants Captain Kenny and C/O Major did not like the Plaintiffs' response then told the Plaintiff, "Your being placed in RHU (Restrictive Housing Unit) pending an investigation"and thereafter the Plaintiff was escorted to the R.H.U.

19. The Plaintiff was placed in Cell 214 and given nothing but a T-shirt as clothes.by Defendants Captain Kenny, C/O Major, John Doe #1, John Doe #2, John Doe #3, John Doe #4, John Doe #5 and John Doe #6.

20.Everytime the Plaintiff request for his underwear and Religious Head Wear, He was given Racial and Degrading response from Defendants John Doe #1, John Doe #2, John Doe #3, John Doe #4, John Doe #5 and John Doe #6, for example stating: "Fake Musilum","Suicide Bomber".

21. The more the Plaintiff asked, the more verbal assault the Defendant's got, for example:stating: "Go back to Iraq if you want to play Muslim", "Your lucky you got a T-Shirt, your Muslim Brothers dont even got it that bad, they get water boarded—so I would shut up", and, "Why do you want to look like a Tampon for"? (Refering to the Tassel on the Plaintiffs' Religious Head Wear).

22. The Plaintiff told the Defendants John Doe #1, John Doe #2, John Doe #3, John Doe #4, John Doe #5 and John Doe #6 that, "It is my right and their Policy to be able allowed to have and wear my Religious Head Wear in R.H.U. or anywhere". The Defendant John Doe #3 response was that, "You have no rights here", "Your little hat is right where it belongs on the f***ing floor". The Plaintiff then asked Defendant John Doe #3 (The Block Officer) to speak to a LT (Lieutenant), Defendant John Doe #3 ignored the Plaintiff.

23. The Block Officer Defendant #4 came around opening the cell traps to feed the inmates. He got to the Plaintiffs' cell and said, "Your not geting shit". The Plaintiff asked him, "Why I cant eat"? The Defendant John Doe #4 said, "You dont get lunch, you dont get shit per Captain Kenny, you Terrorist"! The Plaintiff kept asking Defendant John Doe #4 for his lunch. Defendant John Doe #4 just continued on placing food trays on other inmates trap doors leaving the Plaintiff Trap open and without a Food Tray.

24. The Plaintiff heard Defendant John Doe #4, a few doors down, call Defendant Captain Kenny on the radio, telling him the Plaintiff "Was yelling to be feed, asking for his Religious Head Wear and underwear".

25. Minutes later, the Plaintiff heard a door open and running, then seen a hand in front of his trap door spraying him with Chemical Agent. The Plaintiff seen it was Defendant Captain Kenny that was spraying him, telling him to, "Shut up"!

26. The Plaintiff asked the Defendant Captain Kenny, "Why did you spray me, you know I'm allegic to Chemical Agent", Defendant Captain Kenny kept spraying the Plaintiff. Defendant Captain Kenny Ordered, The Plaintiff to "Come to the door to cuff up", and the Plaintiff did.

27. The Defendants (The Plaintiff was unable to see the Agents) walked the Plaintiff to the shower and put him, while he was cuffed, under the shower for a few seconds, not allowing him to wash the Chemical Agent off of himself.

28. Then escorted the Plaintiff down the Unit stairs. The Plaintiff asked Defendant Captain Kenny, "Why did you spray me"? He did not respond. Instead Defendant Captain kenny said, "I thought you were allergic"? The Plaitiff told the Defendant Captain kenny, "I am", as The Plaintiff struggled to breath.

29. While the Defendants (The Plaintiff was unable to see the Agents) put the Plaintiff in Full In Cell Restraints - Cuffs, Shackle and Teather Chains, his breathing attempt became worst, to the point that the Plaintiff had to be rushed to the outside Hospitol by an Ambulance because he could not breath and was put

4

on Oxygen tanks. The Plaintiff was given a shot to counter the allergic reaction at the Hospitol and provided with a cream to put upon the linning of his Eye lids so that it could be applied daily for a week or two so he could see.

30. Soon thereafter the Plaintiff Complained to the Defendant Corcell, Warden while in R.H.U., Then filed a Grievance on 8/24/18.

31. All of the sudden on 8/28/18 the plaintiff was pulled out of his cell in R.H.U., cuffed and brought to see a State Trooper, Bell, Badge #354 ("Trooper"). The Trooper told the Plaintiff that "(His) property was searched today and (The Defendant C/O Major) found drugs (Cocaine) in his Grey Jordans". The Plaintiff told him,"This must be some kind of Joke".

32. The Trooper told the Plaintiff that, "(He) was given a report (Defendant Captain Kennys' Report) that stated (The Plaintiff) was involved with recent assaults, narcotics and gang activity in the facility". The Plaintiff informed the Trooper that, "All of that statement is a lie, it simply is not true".

33. The Trooper asked the Plaintiff, "Why would they Lie"? And the Plaintiff told the Trooper, "They dont like the fact that I won some rights for a disruptive group — The Nation Of Gods and Earth, which is now recognized as a Religious Group in D.O.C. and an off set of the Muslim Nation".

34. The Trooper asked, "What was the powder in (The Plaintiffs') sneakers"? The Plaintiff told the Trooper, "I only put Foot powder in my sneakers". And that, "I've been in R.H.U. since 8/8/18 for Interfering with Safety or Security and Now twenty (20) days later on 8/28/18 they just happen to go and search the property they had for me in storage and find Cocaine — Right after I make my Complaint to the Warden and file a Grievance on 8/24/18"?

35. Trooper Bell, Bage #354, Case #18-00415011 took the White Powder as evidence. Trooper Bell stated that, "The White powder would be sent to the Lab for analysis due to their Fentanyle Policy". Trooper Bell Also stated that, "(He) will forward the results of the Lab Analysis to the Faicity to include any charges filed".

5

36. The Plaintiffs' Family on or about 2/28/2020 called the Police (State Trooper Barracks) who told his Family the Powder was cleared for "not" being drugs (As the Plaintiff told everyone). The plaintiff was not notified of the findings of this investigation and the sneakers were not returned to the Plaintiff promptly.

### V. EXHAUSTION OF LEGAL REMEDIES

37. The Plaintiff Harris used the Prison Grievance Procedure available to him to try and solve the problem. He presented the facts relating to this Verified Complaint and was denied. Harris's Grievance and Appeals are exhausted.

### VI. LEGAL CLAIM

38. Plaintiff realleged and incorporate by reference paragraphs 1-38.

39. Defendant Kenny used Excessive Force against the Plaintiff when he used Chemical Agent against him several times on 8/8/18 without the Plaintiff violating any Prison Rule, and was not acting Disruptively. Defendant Kenny's action violated Plaintiff Harris's right under the Eighth Amendment to the United States Constitution, and caused Plaintiff Harris Pain, Suffering, Physical Injury and Emotional Distress.

40. Defendant Kenny, Major, John Doe #1, John Doe #2, John doe #3, John Doe #4, John Doe #5, and John Doe #6 used and continued to use Excessive Force against Plaintiff Harris by the Use Of Force - Full In Cell Restraints when the Plaintiff is not violating any Prison Rules, nor Acting Disruptively in any way. Defendants Kenny, Major, John Doe #1, John Doe #2, John Doe #3, John Doe #4, John Doe #5, and John Doe #6 actions violated and continues to violate Plaintiff Harris's right under the Eighth Amandment to the United States Constitution, and is causing Plaintiff Harris, Pain, Suffering, Physical Injury and Emotional Distress.

41. By Defendant Kenny, Major, John Doe #1, John Doe #2, John Doe #3, John Doe #4, John Doe #5, and John Doe #6's Illegal action, Failing to correct that misconduct, and encouraging the continuation of the misconduct Defendant Carcella, Maldanado, and Scott Semple is also violating Plaintiff Harris rights under the

6

Eighth Amendment to the United States Constituion and causing Plaintiff Harris

Pain, Suffering, Physical Injury and Emotional Distress.

42. Defendants Deliberate Indifference to Plaintiffs' Serious Medical Needs

violated Plaintiff Harris's rights , and constituted Cruel and Unusual Punishment

under the Eighth Amendment of the United States Constitution.

43. By Libel or Slander Plaintiff Harris ability to practice his Religion

Freely, in not getting or allowing the Plaintiff to wear his Religious Head Wear,

and assaulting his sincerly held Religious Belief Defendant Kenny, Major, John Doe

#1, John Doe #2, John Doe #3, John Doe #3, John Doe #4, John Doe #5, and, John

Doe #6 violated Plaintiff Harris rights under the First Amendment to the United

States Constitution. These illegal actions are causing Plaintiff Harris Injury to

his First Amendment Rights.

44. By False Report of the Plaintiff to the State Police for exercise of his

right to seek redress from the Prison through use of the Prison Grievance System

for the Fundamental Constituional right to use the Court system, Engaging in

Protected Conduct Defendant Kenny, Major is Retaliating against Plaintiff Harris

unlawfully,in violation of the Plaintiff Harris's rights under the First Amendmant

to the United States Constituion to Petition the Government for redress of

Grievances. These illegal actions are causing Plaintiff injury to his First

Amendment rights.

45. Plaintiff Harris has no plain, adequate or complete remedy at law to redress

the wrongs described herein. Plaintiff has been and will continue to be irreparably

injured by the conduct of the Defendants unless this Court grants the Declaratory

relief which Plaintiff seeks.

## VII. PRAYER FOR RELIEF

46. Wherefore, Plaintiff respectfully prays that this Court enter Judgment

granting Plaintiff:

47. A Declaration that the acts and ommissions described herein violated Plaintiff's rights under the Constitution and Laws of the United States.

48. Compensatory Damages in the amount of $150,000. against each Defendant, jointly and severally.

49. Punitive Damages in the amount of $250,000. against each Defendant.

50. A Jury Trial on all issues triable by a Jury.

51. Plaintiff cost in this suit.

52. Any additional relief this Court deems Just, Proper, and Equitable.

DATE: 5/11/2021

RESPECTFULLY SUBMITTED,

KEVIN HARRIS
ID#225248
CHESHIRE CORRECTIONAL INSTITUTION
900 HIGHLAND AVENUE
CHESHIRE, CT 06410

## VERIFICATION

I have read the foregoing Complaint and hereby verify that the matters alleged on information and beleif, and as to those, I believe them to be true. Icertify under penalty of perjury that the foregoing is true and correct.

Executed at Cheshire, Connecticut on 5/11/2021

KEVIN HARRIS

Subscribed and sworn to before me
This day of 11 May, 2021

Notary Public

My Commission Expires 10/3/24

8

# EXHIBITS INDEX:

| PARAGRAPHS # | EXHIBITS # |
|---|---|
| PAR. #16 THROUGH #29 | EXHIBIT #1 - INMATE REQUEST FORM - REQUESTING TO PRESERVE VIDEO FOOTAGE ON 8/8/18 |
| PAR. #17, #43 | EXHIBIT #2 - MEDICAL RECORD - PHYSICIANS ORDER |
| PAR. #30 | EXHIBIT #3 - ADMINISTRATIVE REMEDIES FORM |
| PAR. #31 | EXHIBIT #4 - PHOTO OF JORDANS |
| PAR. #32 | EXHIBIT #5 - INCIDENT REPORT SUPPLEMENTAL PAGE 8/27/18 BY KENNY. |
| PAR. #30, #34 | EXHIBIT #6 - INCIDENT REPORT - PAGE #1 10/9/18 BY MAJOR (ALL REPORTS) |
| PAR. #35 | EXHIBIT #7 - CONTRABAND/PHYSICAL EVIDENCE TAG + CHAIN OF CUSTODY - / INTELLIGENCE UNIT PHYSICAL EVIDENCE TAG + CHAIN OF CUSTODY / INCIDENT REPORT ROUTING SHEET |
| PAR. #39, #40 | EXHIBIT #8 - ADMINISTRATIVE DIRECTIVES 6.5 USE OF FORCE / 2.17 EMPLOYEE CONDUCT |
| PAR. #43 | EXHIBIT #9 - ADMINISTRATIVE DIRECTIVE 10.8 RELIGIOUS SERVICE |
| PAR #44 #34, #30 | EXHIBIT #10 - NOTE. AFFIDAVIT (S) |

# - EXHIBIT-# 1

1) INMATE REQUEST FORM



# Inmate Request Form
## Connecticut Department of Correction

CN 9601
REV 1/31/09

Inmate name: King Yung Allah / Kevin Harris

Inmate number: 225248

Facility/Unit: Garner C.I.

Housing unit: IPM / Cell 512

Date: 8/17/18

Submitted to: Capt. Capollazo

Request: I'm Respectfully Requesting the Video Footage on 8/8/18 Be Preserved from the Following Times And Locations In Capt. Kenny's Office where myself - him & C/o Major Had A Conversation in that office where i was then escorted to RHU Time 9:10 AM. Preserve the whole Conversation in the Officer As well As the Escort to RHU. & Preserve the Footage that Covers Cell 214 & 213 Top Tier of Fox Unit (RHU) From 9:00 All the Footage that Show the Incident that Happend to Me Being Pepper Sprayed. Also the Footage of the AP Room Hall For Inmate Holding Cells From ~~12:00~~ 2:00 PM to 5:00 PM And the

*Footage of that in the office of me - il that holding cell*

**continue on back if necessary**

Previous action taken: I wrote to Have All Footage that Covers my Incident out the Day of 8/8/18 Thank you!

**continue on back if necessary**

Acted on by (print name): Capellora

Title: Captain

Action taken and/or response:

Downloaded and burned to D.V.D. per above request ~

Ev. # GCI - VP-18-1011

**continue on back if necessary**

Staff signature: Capella

Date: 8/27/18

# - EXHIBIT -#2

1). PHYSICIANS ORDERS.

2) PHYSICIANS ORDERS.

3) PHYSICIANS ORDERS.

4) PHYSICIANS ORDERS,

5) PHYSICIANS ORDERS,

6) PHYSICIANS ORDERS,

7) PHYSICIANS ORDERS,

HR 925 02/2011
CONNECTICUT DEPARTMENT OF CORRECTION
UNIVERSITY OF CONNECTICUT HEALTH CENTER
CORRECTIONAL MANAGED HEALTH CARE

**PHYSICIAN'S ORDERS**   (G)

| INMATE NUMBER: | 2 2 5 2 4 8 | DATE OF BIRTH: 5-26-68 |
|---|---|---|

INMATE NAME (LAST, FIRST, INITIALS): Harris, Kevin

SEX: (M) F    RACE/ETHNIC: (B) W H O    FACILITY: Garner

DRUG ALLERGIES/HYPERSENSITIVITIES: PCN/Tegretol/Chemical Agent.

| Date & Time | ORDERS<br>Prescriber Signature & Title/Nurse Signature & Title<br>*For Medication Orders: Document Medication Dose, Frequency & Route, & Duration.<br>*For topical preparations, provide quantity prescribed (Example: 30 grams, 60 cc, etc.) & type of preparation (lotion, cream, ointment, etc.).<br>*Document indication(s) for PRN medications(s) | Priority Code: (Circle one)<br>Contingency or Routine | Admin. Code: (Circle one)<br>KOP or DOT | Medication Order(s) Scanned to Pharmacy: Date/Time/Initials |
|---|---|---|---|---|
| 10/13/16 1200 | Sling to R Arm X 6 weeks (RCT) | (C) R | (K) D | |
| | Texas Cath Size 32 #7/week | C R | K D | |
| | X 1 year (Stricture) | C R | K D | |
| | Gerald Valletta. MD | C R | K D | |
| | [signature] 10/13/16 1534 | C R | K D | |
| | | C R | K D | |
| 10/13/16 | Eileen Law RN 1545 Verified | (C) R | K D | |
| OCT 17 2016 0900 | Tylenol #3 ＋ PO BID X 2 weeks | (C) R | K (D) | SCANNED |
| | then ＋ PO q daily x 1 week then | C R | K D | |
| | STOP (PAIN) | C R | K D | |
| | Gerald Valletta, MD | | | |
| | [signature] 10/17/16 1130 | C R | K D | |
| | | C R | K D | |
| 10/17/16 | 1150am order verified [signature] | C R | K D | |
| 10/17/16 | REMERON 15mg PO QHS X 7 days the— | (C) R | K (D) | |
| 3pm | REMERON 30mg PO QHS X 83 days | (C) R | K (D) | |
| | Barbara Kimble-Goodman, APRN | | | |
| 10/17/16 1541 | scanned 10/Nbhn | C R | K D | |
| 10/17/16 430 | order verified | C R | K D | |
| | | C R | K D | |
| | | C R | K D | |

MEDICATIONS WILL BE DISPENSED ACCORDING TO BRANDS STOCKED IN THE PHARMACY.
AUTHORIZATION IS HEREBY GIVEN TO DISPENSE THE MEDICATION EQUIVALENT UNDER THE CMHC FORMULARY SYSTEM.

HR 925 02/2011
CONNECTICUT DEPARTMENT OF CORRECTION
UNIVERSTY OF CONNECTICUT HEALTH CENTER
CORRECTIONAL MANAGED HEALTH CARE

**PHYSICIAN'S ORDERS**

| INMATE NUMBER: | 2 2 5 2 4 8 | DATE OF BIRTH: 5/24/68 |
| --- | --- | --- |

INMATE NAME (LAST, FIRST, INITIALS): Harris Kevin

SEX: (M) F     RACE/ETHNIC: (B) W H O     FACILITY: Garner # 136

**DRUG ALLERGIES/HYPERSENSITIVITIES:** PCN, Tegretol, Chemical Agent

| Date & Time | ORDERS Prescriber Signature & Title/Nurse Signature & Title *For Medication Orders: Document Medication Dose, Frequency & Route, & Duration. *For topical preparations, provide quantity prescribed (Example: 30 grams, 60 cc, etc.) & type of preparation (lotion, cream, ointment, etc.). *Document indication(s) for PRN medications(s) | Priority Code: (Circle one) Contingency or Routine | Admin. Code: (Circle one) KOP or DOT | Medication Order(s) Scanned to Pharmacy: Date/Time/Initials |
| --- | --- | --- | --- | --- |
| OCT 24 2016 | Triamcolor 0.1% cream APP BID    refill X 1 year | C (R) | (K) D | |
| 1107 | Clotrimazole 1% cream APP BID    rash | (C) R | (K) D | |
| | Sebex lather X 5 min & rinse 3 times weekly | C R | (K) D | ' |
| | Gerald Valletta, MD | C R | K D | |
| | Noted / Scanned | C R | K D | |
| | (PN) 10/24/16 1540 | C R | K D | |
| | | C R | K D | |
| 10/24/16 | 18:00  Verified c SCJames RN | C R | K D | |
| | | C R | K D | |
| | | C R | K D | |
| | | C R | K D | |
| | | C R | K D | |
| | | C R | K D | |
| | | C R | K D | |
| | | C R | K D | |
| | | C R | K D | |
| | | C R | K D | |
| | | C R | K D | |
| | | C R | K D | |
| | | C R | K D | |
| | | C R | K D | — |

MEDICATIONS WILL BE DISPENSED ACCORDING TO BRANDS STOCKED IN THE PHARMACY.
AUTHORIZATION IS HEREBY GIVEN TO DISPENSE THE MEDICATION EQUIVALENT UNDER THE CMHC FORMULARY SYSTEM.

HR925F Rev. 11/16
CONNECTICUT DEPARTMENT OF CORRECTION
UNIVERSITY OF CONNECTICUT HEALTH CENTER
CORRECTIONAL MANAGED HEALTH CARE

**PHYSICIAN'S ORDERS**          G

| INMATE NUMBER 225 248 | DATE OF BIRTH 5-24-68 |
|---|---|
| INMATE NAME (LAST, FIRST, INITIAL) Harris, Kevin | |
| SEX Ⓜ F | RACE/ETHNIC Ⓑ W H O | FACILITY Garner CI |

INSTRUCTIONS FOR USE:  Physicians must sign name and title under each order.   Each order must be initialed in the space provided by the licensed nurse who transcribed the order. Medications will be dispensed according to brands stocked in pharmacy.

DRUG ALLERGIES / HYPERSENSITIVITY   PCN, tegretol (Chemical Agent)

| Date & Time | Priority Code: Circle one (Contingency, Routine) | Admin. Code: Circle KOP or DOT | ORDER/RATIONALE<br>Prescriber Signature & Title/Nurse Signature & Title |
|---|---|---|---|
| 11/28/16 10:30AM | Ⓒ R | K Ⓓ | **Influenza Vaccine 0.1 mL** INTRADERMAL x 1   ☒Seasonal Flu<br>Inmate denies URI symptoms, allergies to eggs, chicken, feathers, sulfides, any active neurologic disorder, sensitivity to thimerosal, polymyxin B, or neomycin. Inmate denies recently receiving any other type of vaccine; has never had Guillain-Barre Syndrome.   *IVANAVICIENE MD* |
| 1-22-16 11AM | C R | K D | Order noted ~scanned                          Clo... |
| | C R | K D | Verified Hauper RN |
| 2/16/16 930a | Ⓒ R | K Ⓓ | DC Remeron |
| | | | Remeron 30mg PO QHS x 90 days |
| | C R | K D | ...                      Barbara Kimble-Goodman, APRN |
| 2/16/16 105 | C R | K D | scanned / Noted |
| 12/16/16 145P | C R | K D | verified                          Aflexin |
| 1/6/17 10:30 am | Ⓒ R | Ⓚ D | Telephone order from DR. Ivanaviciene for |
| | | | Multivitamin 1 tab PO daily x 6 Months |
| | Ⓒ R | Ⓚ D | also Change ......... 1 tab to Kop |
| | C R | K D | TO: DR. Ivanaviciene J/Aheup NRN |
| | C R | K D | noted Hauper RN   Ⓢ  SCANNED |

AUTHORIZATION IS HEREBY GIVEN TO DISPENSE THE MEDICATION EQUIVALENT (UNDER THE C.D.O.C. FORMULARY SYSTEM) UNLESS THE PRODUCT DESCRIBED IS CIRCLED

1/6/17 order verified AOO Barresa         IVANAVICIENE

HR 925 02/2011
CONNECTICUT DEPARTMENT OF CORRECTION
UNIVERSITY OF CONNECTICUT HEALTH CENTER
CORRECTIONAL MANAGED HEALTH CARE

**PHYSICIAN'S ORDERS**



| INMATE NUMBER: | 2 2 5 2 4 8 | DATE OF BIRTH: 5/24/68 |
| INMATE NAME (LAST, FIRST, INITIALS): | Harris Kevin |
| SEX M F | RACE/ETHNIC: B W H O | FACILITY Corner |

**DRUG ALLERGIES/HYPERSENSITIVITIES:** PCN, Tegretol, Chemical Agent

| Date & Time | ORDERS  Prescriber Signature & Title/Nurse Signature & Title  *For Medication Orders: Document Medication Dose, Frequency & Route, & Duration.  *For topical preparations, provide quantity prescribed (Example: 30 grams, 60 cc, etc.) & type of preparation (lotion, cream, ointment, etc.).  *Document indication(s) for PRN medications(s) | Priority Code: (Circle one) Contingency or Routine | Admin. Code: (Circle one) KOP or DOT | Medication Order(s) Scanned to Pharmacy: Date/Time/Initials |
|---|---|---|---|---|
| 1/17/17 3pm | Clonidine 0.1mg PO QHS x90days | C B | K D | |
| | Please check BP 1° p̄ 1st dose | C R | K D | |
| | and daily x 3 | C R | K D | |
| | Please Coordin APRN  Barbara Kimble-Goodman, APRN | C R | K D | |
| | noted/scanned TWintlndm 1/17/17 9:05am | C R | K D | |
| 1/17/17 | 2215 Above order verified [signature] | C R | K D | |
| | | C R | K D | |
| 2-15-17 11A | Nurse Protocol A 8.1 (Back pain) | C R | K D | |
| | Ibuprofen 200mg 2tabs PO Q4° PRN x3 | C R | K D | |
| | days (take c̄ food when possible to ↓ | C R | K D | |
| | stomach irritation) [signature] | C R | K D | |
| 2-15-17 | scanned/Fax d [signature] | C R | K D | |
| FEB 15 2017 | D/C Ibuprofen | C R | K D | |
| 1300 | Ibuprofen 800mg PO TID pain | C R | K D | |
| | x 3 mnths | C R | K D | |
| 2-15-17 | noted/scanned [signature] 12p  Gerald Valletta, MD | C R | K D | |
| | verified [signature] | C R | K D | |
| 2-15-17 1400 | | C R | K D | |
| | | C R | K D | |
| | | C R | K D | |

MEDICATIONS WILL BE DISPENSED ACCORDING TO BRANDS STOCKED IN THE PHARMACY.
AUTHORIZATION IS HEREBY GIVEN TO DISPENSE THE MEDICATION EQUIVALENT UNDER THE CMHC FORMULARY SYSTEM.

HR 925 02/2011
CONNECTICUT DEPARTMENT OF CORRECTION
UNIVERSITY OF CONNECTICUT HEALTH CENTER
CORRECTIONAL MANAGED HEALTH CARE

**PHYSICIAN'S ORDERS**

INMATE NUMBER: 2 2 5 2 4 8
DATE OF BIRTH: 5/24/68

INMATE NAME (LAST, FIRST, INITIALS): Harris, Kevin

SEX: (M) F   RACE/ETHNIC: (B) W H O   FACILITY: G C I

| DRUG ALLERGIES/HYPERSENSITIVITIES: Penicillin, Tegretol, chemical agents | | Priority Code: (Circle one) Contingency or Routine | Admin. Code: (Circle one) KOP or DOT | Medication Order(s) Scanned to Pharmacy: Date/Time/Initials |
|---|---|---|---|---|
| **Date & Time** | **ORDERS** Prescriber Signature & Title/Nurse Signature & Title *For Medication Orders: Document Medication Dose, Frequency & Route, & Duration. *For topical preparations, provide quantity prescribed (Example: 450 grams, 60 cc, etc.) & type of preparation (lotion, cream, ointment, etc.). *Document indication(s) for PRN medications(s) | | | |
| 2/22/17 10:50A | H/C Remeron, Clonidine | C R | K D | |
| | Remeron 30mg PO QHS x 30 days | (C) R | K (D) | |
| | Clonidine 0.1mg PO QHS | (C) R | (K)(D) | |
| | Harris Goodin-Abby   Barbara Kimble-Goodman, APRN | R | K D | |
| 2/23/17 | 12:14 orders noted/scanned J. Alvarez NP | C R | K D | |
| 2/23/17 | verified Eileen La Rn 1524 | C R | K D | |
| 2/28/17 1:30A | D/C Clonidine | C R | K D | |
| | Paxil 10mg PO QHS x 14 days then | (C) R | K (D) | |
| | Paxil 20mg PO QHS x 76 days | (C) R | K (D) | |
| | Harris Goodin APRN   Barbara Kimble-Goodman, APRN | C R | K D | |
| 2/28/17 | 12:14pm orders noted/scanned J. Alvarez NP | C R | K D | |
| 2/28/17 | pm order verified All Bains Rn | C R | K D | |
| 3/17/17 | Renew: Remeron 30mg PO QHS x 90 days | (C) R | K (D) | |
| 3/17 | Harris Goodin APRN   Barbara Kimble-Goodman, APRN | C R | K D | |
| 3/17/17 | 1539 orders noted/scanned | C R | K D | |
| 3/17/17 | #4 1618 E. La Rn verified | C R | K D | |
| | | C R | K D | |
| 7/20/17 9:50am | - please order creatinine and BUN   WARROVICENT MD | C R | K D | |
| | | C R | K D | |
| | | C R | K D | |

MEDICATIONS WILL BE DISPENSED ACCORDING TO BRANDS STOCKED IN THE PHARMACY.
AUTHORIZATION IS HEREBY GIVEN TO DISPENSE THE MEDICATION EQUIVALENT UNDER THE CMHC FORMULARY SYSTEM.

HR 525 02/2013
CONNECTICUT DEPARTMENT OF CORRECTION
UNIVERSITY OF CONNECTICUT HEALTH CENTER
CORRECTIONAL MANAGED HEALTH CARE

**PHYSICIAN'S ORDERS**

INMATE NUMBER: 2 2 5 2 4 8
DATE OF BIRTH: 5/24/68

INMATE NAME (LAST, FIRST, INITIALS): Harris, Kevin

SEX: M   RACE/ETHNIC: B W H O   FACILITY: 136 GARNER CI

DRUG ALLERGIES/HYPERSENSITIVITIES: PCN, Tegretol Chemical agent

| Date & Time | ORDERS — Prescriber Signature & Title/Nurse Signature & Title | Priority Code: (Circle one) Contingency or Routine | Admin. Code: (Circle one) TOP or TOT | Medication Order(s) Scanned to Pharmacy: Date/Time/Initials |
|---|---|---|---|---|
| 3/20/17 10:20 AM | CXR (r/o pneumonia) | C R | K D | |
| | Phenylephrine Hydrochloride 10mg tab po TID X 3 days | C R | K D | |
| | labs in PSS | C R | K-D | |
| | F/u in 2 weeks | C R | K D | |
| | Gerald Valletta MD | C R | K D | |
| 3/20/17 4:07 | orders noted - CLQ | C R | K D | |
| 3/26/17 | order verified ale Brunson | C R | K D | |
| 3/22/17 | D/C Phenylephrine due to possible anticholinergic s/e | C R | | |
| 3/23/17 1:20 pm | noted - C Thurfurth Gerald Valletta MD | C R | | |
| | verified E. Lau RN | C R | K D | |
| 3/23/17   11 AM | | C R | K D | |
| 3/29/17 3:15 p. | D/C Paxil, Remeron   Barbara Kimble-Goodman, APRN | C R | | |
| | Noted/scanned 3/29/17 448pm E/ortin | C R | K D | |
| 3/30/17 | order verified | C R | K D | |
| | | C R | K D | |
| 4/23/17 10:40 pm | T/O Dr. Johnnie Wright / Munson RN | C R | K D | |
| | Benadryl (50 mg PO (BIT) X 2 days | C R | K D | Munson |

MEDICATIONS WILL BE DISPENSED ACCORDING TO BRANDS STOCKED IN THE PHARMACY.
AUTHORIZATION IS HEREBY GIVEN TO DISPENSE THE MEDICATION EQUIVALENT UNDER THE CMHC FORMULARY SYSTEM.

HR 925 02/2011
CONNECTICUT DEPARTMENT OF CORRECTION
UNIVERSITY OF CONNECTICUT HEALTH CENTER
CORRECTIONAL MANAGED HEALTH CARE

## PHYSICIAN'S ORDERS

| INMATE NUMBER: | 2 3 6 2 4 8 | DATE OF BIRTH: 5/28/64 |
|---|---|---|

INMATE NAME (LAST, FIRST, INITIALS): Harris, Kevin

| SEX: M | RACE/ETHNIC: B / W H O | FACILITY: Garner 136 |

DRUG ALLERGIES/HYPERSENSITIVITIES: PCN Topical Chemical agent

| Date & Time | ORDERS Prescriber Signature & Title/Nurse Signature & Title *For Medication Orders: Document Medication Dose, Frequency & Route, & Duration. *For topical preparations, provide quantity prescribed (Example: 30 grams, 60 cc, etc.) & type of preparation (lotion, cream, ointment, etc.). *Document indication(s) for PRN medications(s) | Priority Code: (Circle one) Contingency or Routine | Admin. Code: (Circle one) KOP or DOT | Medication Order(s) Scanned to Pharmacy: Date/Time/Initials |
|---|---|---|---|---|
| 4/27/17 11:30 A. | Amitriptyline 25mg PO QHS, crushed x 3 days then Amitriptyline 50mg PO QHS x 87 days crushed | C R | K D | verified 4/27/18 |
| | Renew Goodin APRN  Barbara Kimble-Goodman, APRN | C R | K D | 6:35pm Sharon |
| 4/27/17 1348 | orders noted / scanned | C R | K D | |
| 4/27/17 | verified 1 5cc Eilee | C R | K D | |
| | | C R | K D | |
| | | C R | K D | |
| | | C R | K D | |
| | | C R | K D | |
| | | C R | K D | |
| | | C R | K D | |
| | | C R | K D | |
| | | C R | K D | |
| | | C R | K D | |
| | | C R | K D | |
| | | C R | K D | |
| | | C R | K D | |
| | | C R | K D | |

MEDICATIONS WILL BE DISPENSED ACCORDING TO BRANDS STOCKED IN THE PHARMACY.
AUTHORIZATION IS HEREBY GIVEN TO DISPENSE THE MEDICATION EQUIVALENT UNDER THE CMHC FORMULARY SYSTEM.

# – EXHIBIT–#3

1). ADMINISTRATIVE REMEDIES FORM

# CONFIDENTIAL
### (FOR OFFICIAL USE ONLY)

| | |
|---|---|
| Inmate name: | |
| Inmate number: | Housing: |

## SECTION 4: STATE THE PROBLEM AND REQUESTED RESOLUTION

- Provide any factual information that is applicable, including any responses from staff.
- State the action that you think should be taken to resolve the problem.
- PLEASE PRINT.

ON 8-8-18 i WAS TAKEN TO THE CAPT's (KENNY) OFFICE He WANTED TO KNOW WHY i STOOD AROUND DURING A FIGHT SOME TIME DURING THAT CONVERSATION i TOLD HIM HOW im HIGHLY Allergy TO MACE cause He HAD TWO CANS OUT ON HIS DESK (SEE VIDEO i PRESERVED IT) i WAS TAKEN TO RHU FROM HIS OFFICE - WHILE iS SEG i REPEATEDLY ASKED the UNIT OFFICERS TO FEED ME MY lunch - GIVE ME SHEETS + BLANKET + SOME Type OF UNDERWEAR + TO PICK UP MY RELIGIOUS CROWN OFF THE FLOOR OUTSIDE MY Cell + Because OF THAT THEY CALL THE CAPTAIN (KENNY) AND TOLD HIM i WAS BREAKiNG SOMETHING iN THE Cell + THE rush iN THE UNIT (KENNY) AND JUST SPRAYED ME + DID iT REPEATEDLY - KNOWING iT COULD KILL ME + iT's iN MY MEDICAL FILE... iS THAT HOW THiNGS WORK (look AT THAT ViDEO ALSO PRESERVED) AROUND HERE? WHAT WAS i BREAKiNG + WHAT WAS i USiNG iN AN EMPTY Cell TO BREAK iT WiTH? i WROTE THE CAPT. KENNY ASKiNG HiM WHY HE DiDN'T FOLLOW ANY PROTOCAL WHEN HE USED CHEMICAL AGENT ON ME KNOWING iM Allergic TO iT

REMEDY TO RESOLVE THIS:

You CAN NEVER BE TOO CAREFUL WHEN iT COMES TO DOLING OUT POWER, SOME AREN'T AS CAREFUL AS THEY SHOULD BE.

REMOVE HiM FROM HiS POSiTION + TAKE THE CHEMICAL AGENT FROM (KENNY) HiM + REMOVE THE D/R TO THAT INCIDENT.

| | |
|---|---|
| Inmate signature: | Date: 8·24·18 |

- For all remedies except health services, deposit this form in the **Administrative Remedies box.**
- For a health services issue, deposit this form in the **Health Services box.**

## SECTION 5: DECISION / OFFICIAL USE ONLY – DO NOT WRITE IN THE SPACE BELOW

| Date Received: 8/27/18 | IGP #: 136-19-029 | T#: |
|---|---|---|

| Disposition: DENY | Date of Disposition: 10/25/18 |
|---|---|

Reason: YOU FAiLED TO COMPLY W/ VERBAL INSTRUCTION TO CEASE YOUR ATTEMPT OF DESTRUCTING STATE PROPERTY APPROPRIATE FORCE WAS UTILIZED ON COMPLIANCE MODE AD 6.5

| ☐ You have exhausted DOC's Administrative Remedies. | ☑ This matter may be appealed to: N/A MALDONADO |
|---|---|
| Signature: | Date: 10/25/18 |

# - EXHIBIT - 4

1). PHOTO OF JORDANS (SNEAKERS)



# Photograph Evidence
## Connecticut Department of Correction

CN 6904
REV 01/03/17

| ☒ Facility/Unit: Garner Correctional Institution | ☐ Parole Office: |
|---|---|

| Incident Report Number (if applicable): GCI-2018-08-072 | Photo Number: |
|---|---|
| | 1   Of   3 |

| Inmate Name: Harris, Kevin | Inmate Number: 225248 |
|---|---|

Staff member taking photograph: Captain Kenny

Brief Description of the photograph: Grey sneakers owned by inmate Harris #225248

### INSERT one (1) Photograph below:



| Supervisor Name: Captain Kenny | Date: 8/27/18 |
|---|---|
| Supervisor Signature: | |



# Incident Report Package List of Contents
### Connecticut Department of Correction

CN 6605
REV 07/25/16



6CI-2018-08-072



**Connecticut Department of Correction**

# Inmate Overview Sheet

CN 9307

8/28/2018





# Photograph Evidence
## Connecticut Department of Correction

CN 6904
REV 01/03/17

☒ Facility/Unit: Garner Correctional Institution | ☐ Parole Office:

Incident Report Number (if applicable):
GCI-2018-08-072

Photo Number:
2 Of 8

Inmate Name: Harris, Kevin | Inmate Number: 225248

Staff member taking photograph: Captain Kenny

Brief Description of the photograph: Grey sneakers owned by inmate Harris #225248, contraband recovered from underneath sole of sneaker.

INSERT one (1) Photograph below:

Supervisor Name: **Captain Kenny** | Date: 8/27/18

Supervisor Signature:



## Photograph Evidence
### Connecticut Department of Correction

CN 6904
REV 01/03/17

☒ Facility/Unit: Garner Correctional Institution | ☐ Parole Office:

Incident Report Number (if applicable):
GCI-2018-08-072

Photo Number:
3   Of   8

Inmate Name: Harris, Kevin | Inmate Number: 225248

Staff member taking photograph: Captain Kenny

Brief Description of the photograph: Grey sneakers owned by inmate Harris #225248, contraband recovered from underneath sole of sneaker.

INSERT one (1) Photograph below:



Supervisor Name: **Captain Kenny** | Date: 8/27/18

Supervisor Signature:



# Photograph Evidence
## Connecticut Department of Correction

CN 6904
REV 01/03/17

| ☒ Facility/Unit: Gamer Correctional Institution | ☐ Parole Office: |
|---|---|

| Incident Report Number (if applicable): GCI-2018-08-072 | Photo Number: 4 Of 8 |
|---|---|

| Inmate Name: Harris, Kevin | Inmate Number: 225248 |
|---|---|

Staff member taking photograph: Captain Kenny

Brief Description of the photograph: White powder recovered and test kit showing positive for cocaine.

INSERT one (1) Photograph below:

| Supervisor Name: Captain Kenny | Date: 8/27/18 |
|---|---|
| Supervisor Signature: | |



# Photograph Evidence
## Connecticut Department of Correction

CN 6904
REV 01/03/17

| ☒ Facility/Unit: Garner Correctional Institution | ☐ Parole Office: |
|---|---|
| Incident Report Number (if applicable): GCI-2018-08-072 | Photo Number: 5 Of 8 |
| Inmate Name: Harris, Kevin | Inmate Number: 225248 |

Staff member taking photograph: Captain Kenny

Brief Description of the photograph: White powder recovered and test kit.

INSERT one (1) Photograph below:

| Supervisor Name: Captain Kenny | Date: 8/27/18 |
|---|---|
| Supervisor Signature: | |

 **Photograph Evidence**
**Connecticut Department of Correction**

CN 6904
REV 01/03/17

| ☒ Facility/Unit: Garner Correctional Institution | ☐ Parole Office: |
|---|---|

| Incident Report Number (if applicable):<br>GCI-2018-08-072 | Photo Number:<br>6 Of 8 |
|---|---|

| Inmate Name: Harris, Kevin | Inmate Number: 225248 |
|---|---|

Staff member taking photograph: Captain Kenny

Brief Description of the photograph: Test kit showing positive for cocaine.

INSERT one (1) Photograph below:

| Supervisor Name: Captain Kenny | Date: 8/27/18 |
|---|---|
| Supervisor Signature: | |



# Photograph Evidence
## Connecticut Department of Correction

CN 6904
REV 01/03/17

| ☒ Facility/Unit: Garner Correctional Institution | ☐ Parole Office: |
|---|---|
| Incident Report Number (if applicable):<br>GCI-2018-08-072 | Photo Number:<br>7 Of 8 |
| Inmate Name: Harris, Kevin | Inmate Number: 225248 |

Staff member taking photograph: Captain Kenny

Brief Description of the photograph: Test kit showing positive for cocaine.

INSERT one (1) Photograph below:

| Supervisor Name: **Captain Kenny** | Date: **8/27/18** |
|---|---|
| Supervisor Signature: | |



# Photograph Evidence
## Connecticut Department of Correction

CN 6904
REV 01/03/17

| ☒ Facility/Unit: Garner Correctional Institution | ☐ Parole Office: |
|---|---|

| Incident Report Number (if applicable): GCI-2018-08-072 | Photo Number: _8_ Of _9_ |
|---|---|

| Inmate Name: Harris, Kevin | Inmate Number: 225248 |
|---|---|

Staff member taking photograph: Captain Kenny

Brief Description of the photograph: Test kit showing positive for cocaine.

INSERT one (1) Photograph below:

| Supervisor Name: **Captain Kenny** | Date: **8/27/18** |
|---|---|
| Supervisor Signature: | |

# —EXHIBIT—5

1). INCIDENT REPORT SUPPLEMENTAL PAGE #1 — 8/27/18 By Kenney

# Incident Report – Supplemental Page
## Connecticut Department of Correction

CN 6601/3
REV 7/20/15

| Report Number: GCI-2018-08-023 | Page | 4 | of | 5 |
|---|---|---|---|---|

☒ Facility/Unit: Garner Correctional Institution   ☐ Parole Office/Unit:

| Date: 8/27/18 | Time: 8:00  ☒ am ☐ pm | Incident Class: ☐ 1 ☒ 2 ☐ 3   Type: H |
|---|---|---|

Incident Location: Phone Room

| Prepared By: ▓▓▓ Kenny | Title:   Captain |
|---|---|

Narrative:

On Monday August 27, 2018 I, Captain ▓▓▓ Kenny, was assigned as a Unit Manager at the Garner Correctional Institution on 1st shift (8:00am-4:00pm). At approximately 8:00am Officer ▓▓▓ Major notified me that he was going to conduct a thorough inspection of inmate Harris, Kevin #225248 property. It should be noted that the property was already secured in the Property Room due to inmate Harris being in the Restrictive Housing Unit for his involvement with recent assaults, narcotics, and gang activity in the facility.

Officer Major notified me that he recovered a white powdery substance located in the right sole of inmate Harris' grey Jordan sneakers. Officer Major tested the substance utilizing the Scott Reagent System Modified G test; the powdery substance tested positive for cocaine. I took photographs of the sneakers, white powder and positive test kit. The photographs were downloaded to a disc which was labelled, logged (GCI-VP-18-1229), and secured in the safe located in the Lieutenants Office. The white powder (GCI-IU-18-017) and grey sneakers (GCI-IU-18-019) were secured as evidence. Duty Officer Deputy Warden ▓▓▓ Egan was notified of the findings.

Due to a shakedown in the Alpha Housing Unit on 2nd shift on August 27, 2018, K-9 Officer ▓▓▓ Ellison and Narcotics trained K-9 Ghost were in the facility. Officers Major and Ellison utilized Ghost to see if the dog would alert on the white powdery substance. Officer Major hid the white powder underneath the desk in the Phone Room. K-9 Ghost entered the room and immediately alerted on the white powdery substance. The white powder was secured in the evidence locker in the Phone Room.

On Tuesday August 28, 2018 Deputy Warden Egan was updated regarding the positive alert from K-9. The determination was made to notify Connecticut State Police. Officer Major notified Connecticut State Police of the findings and they sent a Trooper to the facility.

Trooper Bell, Badge #354, reported to the facility and was notified of the findings. Trooper Bell attempted to interview inmate Harris; due the exasperated state of inmate Harris the interview was terminated. Trooper Bell issued case #18-00415011 and took the white powder as evidence. Trooper Bell stated that the white powder would be sent to the lab for analysis due to their fentanyl policy. Trooper Bell stated that he will forward the results of the lab analysis to the facility to include and charges filed.

In consultation with the administration, a Disciplinary Report was not generated at the time of this report. Inmate Harris has recently been issued multiple Disciplinary Reports (Class A) and due to the threat he poses to the safety of staff and inmates, it has been determined to transfer him out of the facility as soon as possible. Further investigation is ongoing regarding the narcotics.

| Reporting Employee Signature: | | Title:  Captain |
|---|---|---|
| Report Date:   8/28/18 | Report Time: 3:16   ☐ am ☒ pm | Type: ☐ Individual ☒ Summary |

# -EXHIBIT #6

1). INCIDENT REPORT - PAGE #1  10/9/18 By MAJOR (All REPORTS)

# Incident Report – Page 1
## Connecticut Department of Correction

CN 6601/1
REV 7/20/15

☒ Facility/Unit: Garner C.I.     ☐ Parole Office/Unit:

| Date: 8/27/18 | Time: 8:00 | ☒ am ☐ pm | Report Number: 6C1-2018-08-072 |
|---|---|---|---|

Incident Class: ☐ 1 ☒ 2 ☐ 3    Type: H    Incident Location: Phone Room

Prepared By: Major, ▉        Title: Correctional Officer

| Inmate Name (Last & First) | ID Number | Race | Housing | Status | Staff Name (Last & First) | Race | Title | Status |
|---|---|---|---|---|---|---|---|---|
| Harris, Kevin | 225248 | B | G-219 | S | Major, ▉ | W | C/O | RPE |
| | | | | | Kenny, ▉ | W | CPT | RS |
| | | | | | Ellison, ▉ | B | C/O | RSE |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

### Status and Race Codes

V (Victim), S (Suspect), RPE (Reporting Employee), IW (Inmate Witness), EW (Employee Witness), RSE (Responding Employee), RS (Responding Supervisor)
A (Asian), B (Black), H (Hispanic), N (Native American), W (White), O (Other)

Narrative:
On 8/27/18 at approximately 8:00 a.m., I, Officer Major assigned to the Intelligence Officer at Garner C.I. determined to conduct a thorough shakedown of inmate Harris, Kevin #225248 property in the Property Room due to the amount of property and the recent involvement inmate Harris had with ▉▉▉▉▉▉ and the class A Contraband (Suboxone) on 8/13/18. During the Shakedown of inmate Harris's property this officer found a white powdery substance located in the right sole of the Grey Jordan's shoes size 9.5. This officer tested the White Powdery substance with Scott Reagent System Modified G test. When testing the white powdery substance it tested positive for Cocaine. This officer secured the White powdery substance in the Intelligence evidence locker and notified a supervisor. Due to a shakedown in Alpha unit, K-9 handler Ellison and Narcotics trained k-9 Ghost where in the facility. This officer utilized the K-9 to see if the dog would alert on the white powdery substance. This officer hide the white powder underneath the desk. The K-9 ghost entered the room and alerted on the white powdery substance. At this time this officer secured the white powdery substance in the intelligence evidence locker.

Continue to Next Supplemental Page

| Reporting Employee Signature: | Title: Correctional Officer |
|---|---|
| Report Date: 10/9/18 | Report Time: 9:30 ☒ am ☐ pm | Type: ☒ Individual ☐ Summary |

### FOLLOW-UP

Property damage: ☐ yes ☒ no   - Description:       Value $: N/A

Contraband recovered: ☒ yes ☐ no   - Description: White Powder 6C1-IU-18-017

Physical force used: ☐ yes ☒ no   Chemical agents used: ☐ yes ☒ no   Restraints used: ☐ yes ☒ no

Assigned to:
☐ Administrative Detention    ☐ Medical    ☐ Staggered Observation
☐ Protective Custody    ☐ Outside hospital: _____
☒ Other: Forwarded to CSP

GCI-2018-08-073



**STATE OF CONNECTICUT**
**DEPARTMENT OF EMERGENCY SERVICES AND PUBLIC PROTECTION**
**DIVISION OF STATE POLICE**

## Victim/Witness Statement

| Date: 8/28/18 | Time Started: 1400 | Time Ended: 1418 | CFS #: 1800415011 |
|---|---|---|---|
| Location: Garner CI   Newtown CT | | Statement taken by: TFC U. Neu #334 | |

I, _____ Major _____ Date of Birth: _____

of ___ Garner CI ___ Town/City: Newtown State: CT

I make the following statement, without fear, threat or promise. I have been advised that any statement(s) made herein which I do not believe to be true, and which statement is intended to mislead a public servant in the performance of his / her official function, is a crime under C.G.S. section 53a-157b and is punishable by law.

I currently hold the rof Major of Corrections at Garner CI. I am working as an unit officer currently. ████████████

Inmate Harris was still being investigated and on 8/8/18 he was transferred from his single-occupancy cell, 6-219, to THU and then to segregation. This transfer was due to behavioral issues and written warnings involving issues. As a course of normal business inmate Harris' property was removed from his cell and taken to the Property Receipt Room. Due to his prior involvement in the previous segment incident I separated inmate Harris' property which I found a small clear manual baggie (one side clear and one side white) in the toe of his right knee high brown sneakers. I tested the white powdery substance in the baggie and got a positive hit for Cocaine. This search was conducted on 8/27/18. The baggie was secured in an evidence locker ahead in the evening a K-9 was brought to the baggie for state wide. I asked the K-9 handler officer Ellison if he could see if his K-9 "Ghost" would hit to the baggie substance. K-9 "Ghost" positively hit to the substance. The state police were then called on 8/28/18.

By affixing my signature to this statement, I acknowledge that I have read it and / or have had it read to me and it is true to the best of my knowledge & belief.

| Victim/Witness Name: ____ Major ____ | Victim/Witness Signature: | Date: 8/28/18 |
|---|---|---|
| Parent/Guardian Name: | Parent/Guardian Signature: | Date: |

Personally appeared the signer of the foregoing statement and made oath before me to the truth of the matters contained therein. If notarized, endorse here:

Oath Taken By: __Mathew Neu__     __TFC U. Neu #334__     __8/28/18__
      Name                  Signature         Date Signed

| Witness Name: | Witness Signature: | Date: |
|---|---|---|

CITIZEN'S COPY

# — EXHIBIT—7

1). CONTRABAND / PHYSICAL EVIDENCE TAG & CHAIN OF CUSTODY

2). INTELLIGENCE UNIT PHYSICAL EVIDENCE TAG & CHAIN OF CUSTODY
   TWO PAGE

3). INCIDENT REPORT ROUTING SHEET



# Contraband/Physical Evidence Tag
# and Chain of Custody
## Connecticut Department of Correction

CN 6901 1/2
REV
06/28/17

| ☒ Facility/Unit: Garner Correctional Institution | ☐ Parole Office: |
|---|---|
| Unit Tracking Number: GCI-VP-18-1229 | Incident Report Number: GCI-2018-08-072 |

### Classification of Physical Evidence

| | | |
|---|---|---|
| ☐ Weapon | ☐ Drug/drug paraphernalia | ☐ Alcohol (commercial or homemade) |
| ☐ Clothing | ☐ Cellular/Digital Device | ☐ Miscellaneous property |
| ☒ Written record, video tape/disc, digital image, photograph or audio recording | | |
| ☐ Appliance (e.g., television, radio, stereo, recorder, etc.) | | |
| ☐ Currency (money or other commodity of exchange) | | |
| ☐ Staff Contraband | | |
| ☐ Other (describe) | | |

### Evidence to be preserved for possible action as follows:

| ☒ Administrative | ☐ Criminal |
|---|---|

Brief description of item or substance and any identifying mark(s):

DVD containing nine (9) photographs regarding contraband recovered from inmate Harris, Kevin #225248 property.

Location found/confiscated: Inmate Harris' grey sneakers.

| By (staff name): Captain Kenny | Date: 8/27/18 | Time: 11:00 | ☒AM ☐PM |
|---|---|---|---|
| From (inmate name): Harris, Kevin | | Inmate number: 225248 | |

### Chain of custody - physical evidence (signature required)

| Staff from: Captain Kenny | Date: 8/27/18 | Time: 11:00 | ☒AM ☐PM |
|---|---|---|---|
| Staff to: Evidence Safe | Date: 8/27/18 | Time: 11:00 | ☒AM ☐PM |
| Reason: Evidence | Disposition: Retained | | |

| Staff from: | Date: | Time: | ☐AM ☐PM |
|---|---|---|---|
| Staff to: | Date: | Time: | ☐AM ☐PM |
| Reason: | Disposition: | | |

| Staff from: | Date: | Time: | ☐AM ☐PM |
|---|---|---|---|
| Staff to: | Date: | Time: | ☐AM ☐PM |
| Reason: | Disposition: | | |

### Continue on page 2 for additional entries

## Intelligence Unit Physical Evidence Tag and Chain of Custody
### Connecticut Department of Correction

CN 6903
REV 1/03/17

| Facility/Unit: Garner C.I. | Date: 8/28/18 |
|---|---|

| Intelligence Unit (IU) Number:GCI-IU-18-019 | Telephone Monitor Inquiry (TMI) Number: |
|---|---|

### Classification of Physical Evidence

☐ CD-R Master recording(s):

| Description: * See attached copy of Call Detail Report. | Conversation(s) locked: ☐ Yes  ☐ No |
|---|---|

☐ CD-R Copy:

Description:

Facility/Unit:

☐ Cassette Copy:  Conversation(s) locked: ☐ Yes  ☐ No

Description:

| Date of call: | Time of call: | Duration: |
|---|---|---|

| Station number: | Facility/Unit: |
|---|---|

☐ Document:

Description:

| ☐ Incoming | Return address: |
|---|---|

| ☐ Outgoing | Addressed to: |
|---|---|

☒ Other: Grey Jordans Size 9.5

Location found/confiscated: Property Room

| By (staff name): Major , ▓▓▓ | Date: 8/28/18 | Time: 8:30 | ☒ am ☐ pm |
|---|---|---|---|

| From  (inmate name): Harris, Kevin | Inmate number : 225248 |
|---|---|

### Chain of Custody - Physical Evidence (signature required)

| From: Major, ▓▓▓ | Date: 8/28/18 | Time: 8:30 | ☒ am ☐ pm |
|---|---|---|---|
| To: Intel Evidence Locker | Date: 8/28/18 | Time: 8:30 | ☒ am ☐ pm |

Reason: Evidence

| From: | Date: | Time: | ☐ am ☐ pm |
|---|---|---|---|
| To: | Date: | Time: | ☐ am ☐ pm |

Reason:

| From: | Date: | Time: | ☐ am ☐ pm |
|---|---|---|---|
| To: | Date: | Time: | ☐ am ☐ pm |

Reason:

| From: | Date: | Time: | ☐ am ☐ pm |
|---|---|---|---|
| To: | Date: | Time: | ☐ am ☐ pm |

Reason:

**A SEPARATE CN 6903 MUST BE PREPARED FOR EACH ARTICLE OF EVIDENCE.**

# Intelligence Unit Physical Evidence Tag and Chain of Custody
## Connecticut Department of Correction

CN 6903
REV 1/03/17

| Facility/Unit: Garner C.I. | Date: 8/27/18 |
|---|---|

| Intelligence Unit (IU) Number: GCI-IU-18-017 | Telephone Monitor Inquiry (TMI) Number: |
|---|---|

### Classification of Physical Evidence

☐ CD-R Master recording(s):

| Description: * See attached copy of Call Detail Report. | Conversation(s) locked: ☐ Yes ☐ No |
|---|---|

☐ CD-R Copy: | Conversation(s) locked: ☐ Yes ☐ No

Description:

Facility/Unit:

☐ Cassette Copy: | Conversation(s) locked: ☐ Yes ☐ No

Description:

| Date of call: | Time of call: | Duration: |
|---|---|---|

| Station number: | Facility/Unit: |
|---|---|

☐ Document:

Description:

| ☐ Incoming | Return address: |
|---|---|

| ☐ Outgoing | Addressed to: |
|---|---|

☒ Other: White Powder in one side clear one side white medical pill package

Location found/confiscated: Property Room In right sole of Grey Jordans

| By (staff name): Major, ▮▮▮ | Date: 8/27/18 | Time: 8:30 ☒ am ☐ pm |
|---|---|---|

| From (inmate name): Harris, Kevin | Inmate number : 225248 |
|---|---|

### Chain of Custody - Physical Evidence (signature required)

| From: Major, ▮▮▮ | Date: 8/27/18 | Time: 8:30 ☒ am ☐ pm |
|---|---|---|
| To: Intel Evidence Locker | Date: 8/27/18 | Time: 8:30 ☒ am ☐ pm |

Reason: Evidence

| From: C/o Major | Date: 8-28-18 | Time: 1:15 ☐ am ☒ pm |
|---|---|---|
| To: CSP Trooper Bell TFC M-Kell #334 | Date: 8-28-18 | Time: 1:15 ☐ am ☒ pm |

Reason: Evidence / Criminal Prosecution

| From: | Date: | Time: ☐ am ☐ pm |
|---|---|---|
| To: | Date: | Time: ☐ am ☐ pm |

Reason:

| From: | Date: | Time: ☐ am ☐ pm |
|---|---|---|
| To: | Date: | Time: ☐ am ☐ pm |

Reason:

A SEPARATE CN 6903 MUST BE PREPARED FOR EACH ARTICLE OF EVIDENCE.



**STATE OF CONNECTICUT
DEPARTMENT OF CORRECTION
GARNER CORRECTIONAL INSTITUTION
50 NUNNAWAUK ROAD
NEWTOWN, CT 06470**

## INCIDENT REPORT ROUTING SHEET

INCIDENT DATE: __8/27/18__          INCIDENT NUMBER: __GCI-2018-08-072__

<u>Video Reviewed:</u>   Yes or No                    Initials: _____

<u>Shift Commander:</u>  _Capt d_

Comments _Package unl   10-25-18_
_____
_____
_____

<u>Administrative Review:</u>  Yes or No

Comments:_____
_____
_____

Deputy Warden
Review: _Review d forwards  10-26-18_
_____
_____
_____

Deputy Warden
Review:_____
_____
_____
_____

Warden
Review: _____
_____
_____

_____

Rev. 10/19/17

# _EXHIBIT_ 8

1). ADMINISTRATIVE DIRECTIVE 6.5 - USE OF FORCE

2). ADMINISTRATIVE DIRECTIVE 2.17 — Employee Conduct

| State of Connecticut Department of Correction | Directive Number 6.5 | Effective Date 2/13/2013 | Page 1 of 14 |
|---|---|---|---|
| ADMINISTRATIVE DIRECTIVE | Supersedes | Use of Force, dated 4/1/2011 | |
| Approved By *Leo C. Arnone* Commissioner Leo C. Arnone | Title | Use of Force | |

1. **Policy**. The Department of Correction shall set forth the circumstances under which correctional staff are authorized to use physical and/or deadly physical force in the performance of their duties.

2. **Authority and Reference**.

   A. United States Constitution, Eighth Amendment: Whitley v. Albers, 475 U.S. 312 (1986) and Hudson v. McMillian, 503 U.S. 1, (1992).

   B. Connecticut General Statutes, Sections 18-81, 53a-3(4), 53a-3(5), 53a-18 through 53a-22.

   C. Administrative Directives 2.7, Training and Staff Development; 4.7, Records Retention; 6.2, Facility Post Orders and Logs; 6.4, Transportation and Community Supervision of Inmates; 6.6, Reporting of Incidents; 6.9, Control of Contraband and Physical Evidence; 6.11, Canine Unit; 7.2, Armories; 7.3, Emergency Plans; 7.4, Emergency Response Units; 8.5, Mental Health Services; 8.6, Credentials of Health Services Staff; and 9.4, Restrictive Status.

   D. American Correctional Association, Standards for the Administration of Correctional Agencies, Second Edition, April 1993, Standard 2-CO-3A-01.

   E. American Correctional Association, Standards for Adult Correctional Institutions, Fourth Edition, January 2003, Standards 4-4090 through 4-4092, 4-4190, 4-4191, 4-4199, 4-4202, 4-4204, 4-4206 and 4-4281.

   F. American Correctional Association, Performance-Based Standards for Adult Local Detention Facilities, Fourth Edition, June 2004, Standards 4-ALDF-2B-01, 4-ALDF-2B-03, 4-ALDF-2B-04, 4-ALDF-2B-07, 4-ALDF-6A-07 and 4-ALDF-7B-16.

   G. American Correctional Association, Standards for Adult Probation and Parole Field Services, Third Edition, August 1998, Standards 3-3175 and 3-3176.

   H. American Correctional Association, Standards for Correctional Training Academies, First Edition, May 1993, Standards 1-CTA-3A-20, 1-CTA-3A-23 and 1-CTA-3A-24.

   I. National Commission on Correctional Health Care, Standards for Health Services in Prisons, 1999, Standard P-66.

3. **Definitions and Acronyms**. For the purposes stated herein, the following definitions and acronyms apply:

   A. **Barricade Obstruction Tool** (BOT). An armory item utilized to safely move or remove a barricade or obstruction from the interior of a cell door from the outside in an effort to assist in the effective deployment of chemical agent into the cell.

   B. **Chemical Agent Devices**. Chemical agent devices consist of two (2) categories:

      1. Category I devices are hand held aerosol dispensers; and,
      2. Category II devices consist of all methods of administration other than hand held aerosol devices.

| Directive Number | Effective Date | Page 2 of 14 |
|---|---|---|
| 6.5 | 2/13/2013 | |
| Title | | |
| | Use of Force | |

C.  CMHC. Correctional Managed Health Care.

D.  Deadly Physical Force. Physical force which can be reasonably expected to cause death or serious physical injury.

E.  Full Stationary Restraint. Securing an inmate by the four (4) points of the arms and legs to a stationary surface.

F.  In-Cell Restraint. Restraint within a cell of an acutely disruptive inmate utilizing one or more of the following restraining devices as appropriate: handcuffs, leg irons, security (tether) chain, belly chains, flex cuffs and/or black box.

G.  Less-than-Lethal Munitions. Ammunition, to include Category II chemical agent projectiles or impact rounds, not reasonably expected to cause death or serious physical injury.

H.  Lethal Munitions. Ammunition that when used may reasonably be expected to cause death or serious physical injury.

I.  OC. Oleoresin Capsicum.

J.  Physical Force. Physical contact or contact through use of an armory item/canine initiated by a staff member in response to a non-compliant inmate for the purposes of establishing, maintaining or restoring control, order, safety and/or security. Routine use of physical contact shall not be considered physical force, including the routine use of restraints.

K.  Qualified Mental Health Provider. Psychiatrists, psychologists, psychiatric nurse clinicians, psychiatric social workers, and others who by virtue of their education, credentials and experience are permitted by law to evaluate and care for the mental health needs of inmates.

L.  Restraints. Restraints shall include any mechanical device used to control the movement of an inmate's body and/or limbs, including but not limited to flex cuffs, soft restraints, hard metal handcuffs, a black box, Chubb cuffs, leg irons, belly chains, a security (tether) chain or a convex shield.

M.  Serious Physical Injury. Physical injury which creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ.

N.  Therapeutic Restraints. Full stationary restraints that are ordered by a psychiatrist or physician as part of a medical or mental health treatment.

O.  UCHC. University of Connecticut Health Center.

4.  General Principles.

A.  A Department employee may use physical force on an inmate to maintain discipline, order, safety and security while in the performance of the employee's official duties. The amount of force used shall be reasonable and appropriate to the circumstances based on the situation, the information in the possession of correctional personnel at the time, and the information reasonably available under the circumstances. Force shall be utilized in order to promote the safety of the public, staff and inmates and shall be based on sound correctional objectives.

B.  Prior to a planned use of physical force, a correctional supervisor shall summon a video camera which shall document the verbal intervention as well as the planned use of physical force in accordance with Section 19 of this Directive. When verbal

| Directive Number | Effective Date | Page 3 of 14 |
|---|---|---|
| 6.5 | 2/13/2013 | |

| Title | |
|---|---|
| Use of Force | |

intervention is unsuccessful, the correctional supervisor and a health services staff member shall confer and gather pertinent information about the inmate's health status and any immediate concerns.

When there is no immediate threat to staff, the inmate, others or the order or the safety and security of the facility, and the inmate is secure, voluntary cooperation, control and compliance shall be attempted by verbal intervention by available health services, custody or other Department staff. Whenever practical, treatment staff (i.e., mental health, medical, or counseling staff) shall be utilized prior to a planned use of physical force. This attempt shall be documented in the supervisor's report.

A correctional supervisor shall issue a last verbal warning to the inmate and advise the inmate that force shall be used to include, but not limited to chemical agents and/or canine, and provide the inmate with a reasonable amount of time to comply with lawful direction before initiating the use of physical force. In the event such measures are unsuccessful, reasonable physical force may be utilized. Prior to the planned use of physical force, the supervisor shall designate the appropriate staff to apply such physical force in accordance with this Directive.

Staff may immediately use force and/or apply restraints when an inmate's behavior constitutes an immediate threat to self, others, property, order or the safety and security of the facility.

C. In addition to the requirements listed in Section 4(B) of this Directive, prior to a planned use of physical force on an inmate housed in a designated housing unit for the mentally ill, clinical intervention shall be attempted by a qualified mental health provider, acting in consultation, if possible, with a doctoral-level clinician. A qualified mental health provider shall attempt to verbally counsel the inmate and attempt to persuade the inmate to cease the behavior that has led to the planned use of physical force. The qualified mental health provider shall document this process in the inmate's health record. The Shift Commander or designee shall document all attempted intervention in the supervisory report.

D. Physical force shall be reasonably related to the degree and duration necessary to achieve its authorized objective.

E. Physical force shall not be used for the harassment or punishment of any person.

F. A planned use of physical force shall be carried out by personnel in hazardous duty classifications. Use of physical force by other personnel shall be used in accordance with Section 22 of this Directive.

G. An employee who is issued an armory item shall be authorized to use the item subject to the chain of command and in accordance with this Directive and Administrative Directive 7.2, Armories.

H. Prior to the use of deadly physical force a verbal warning shall be given where feasible.

I. An authorized Universal Precaution Safety Veil may be used in accordance with Section 10 of this Directive, if there is an immediate threat of spitting by an inmate or a reasonable belief that spitting may recur. Except for the use of the Universal

| Directive Number | Effective Date | Page 4 of 14 |
|---|---|---|
| 6.5 | 2/13/2013 | |
| Title | | |
| | Use of Force | |

Precaution Safety Veil, the placement of objects in proximity to the inmate's airway is prohibited. This shall not preclude the temporary use of a plastic convex shield if a Universal Precaution Safety Veil is not immediately available. In such circumstances, the Universal Precaution Safety Veil shall be procured and utilized as soon as possible. No other object or device for this purpose is authorized.

J.   Each person involved in a use of physical force shall be attentive to and conscious of changes in inmate behavior or demeanor that might indicate physical distress or any other physical side effect related to the use of physical force (e.g., trouble breathing, unresponsive, etc.).

K.   A supervisor shall limit those staff involved in the use of physical force to those who are reasonably considered necessary to control and contain the incident.

L.   A supervisor shall direct the actions of responding staff and continually assess the well being of both staff and inmates.

M.   The supervisor in charge shall not normally become directly involved in physically restraining an inmate. Should the supervisor be involved in a use of physical force, the supervisor shall disengage, as much as possible, while supervising the incident.

N.   All persons injured or claiming injury in an incident shall receive immediate medical examination and treatment.

O.   All instances of personnel discharging firearms, using chemical agents or any other weapon or use of physical force to control inmates shall be documented to establish the identities of staff, inmates and others involved, and to describe the nature of the incident in accordance with this Directive and Administrative Directive 6.6, Reporting of Incidents.

P.   All hazardous duty staff shall be trained in approved methods of self-defense and use of physical force in accordance with Administrative Directive 2.7, Training and Staff Development.

Q.   Personnel authorized to use firearms and chemical agents shall be provided appropriate training to include use, safety, care and constraints. All authorized personnel shall demonstrate competency in their use at least annually in accordance with Administrative Directive 2.7, Training and Staff Development.

5.   Use of Physical Force. Correctional employees are authorized to use reasonable physical force upon another person in the performance of their official duties:

A.   to maintain order and discipline;

B.   to prevent a suicide or the self-infliction of injury;

C.   to defend themselves or a third person from what they reasonably believe to be the use or imminent use of physical force; or,

D.   when and to the extent that they reasonably believe such to be necessary to prevent an inmate escaping from custody.

6.   Use of Deadly Physical Force. Deadly physical force shall only be authorized when it is necessary to: 1) defend himself/herself or a third person from the use or imminent use of deadly physical force; or 2) to prevent an escape of a person reasonably believed to have committed or attempted to commit a felony involving the infliction or threatened infliction of serious physical injury. Deadly physical force shall not be permitted if it is feasible to give a warning of the intent to use deadly

| Directive Number 6.5 | Effective Date 2/13/2013 | Page 5 of 14 |
|---|---|---|
| Title | Use of Force | |

physical force until such warning has been given. An inmate's criminal conviction history may be used in order to form a reasonable belief that the inmate has committed or attempted to commit a felony involving the infliction or threatened infliction of serious physical injury.

A. <u>Protection of Persons</u>. Deadly physical force may be used to defend oneself or another person from the use or imminent use of deadly physical force.

B. <u>Prevention of Escapes</u>. Deadly physical force may be used to prevent the escape of a person from custody whom an employee reasonably believes has committed a felony which involved the infliction or threatened infliction of serious physical injury.

1. Deadly physical force may be used if the inmate who is attempting to escape from custody has committed, is reasonably believed to have committed, or has attempted to commit a felony which involved the infliction or threatened infliction of serious physical injury and if, where feasible, the employee has given warning of the employee's intent to use deadly physical force.

2. In the event firing a weapon is likely to endanger any by-stander during an escape, staff shall not discharge the weapon even if it allows the escape attempt to be successful. Prior to the use of deadly physical force, a verbal warning shall be given if at all feasible. Warning shots shall not be authorized.

3. In no case may the use of deadly physical force be justified solely on the grounds of the security classification of the facility from which the escape is attempted.

7. <u>Chemical Agents</u>. Chemical agents shall be designated as Category 1 or 2 devices and may be authorized for use by properly trained and certified staff as follows:

A. <u>Category I Chemical Agents</u>. A properly trained and currently certified custody supervisor or designated Department employee may be authorized to routinely carry and use as appropriate a Category I chemical agent. OC shall be authorized for use as appropriate during transportation in accordance with this Directive. A custody supervisor may authorize the issuance and use as appropriate of Category I chemical agents to trained and certified staff in accordance with this Directive and Administrative Directive 7.2, Armories. Upon the direction of a supervisor, a tactical operations team member shall be authorized to carry and use Category I chemical agents in accordance with this Directive.

B. <u>Category II Chemical Agents</u>. Specially trained and designated staff may use Category II chemical agents on the authorization of the highest ranking onsite facility supervisor and subject to the direct supervision of a custody supervisor in accordance with this Directive.

C. <u>List of Authorized Personnel</u>. A current list of personnel certified and authorized to use chemical agents shall be posted and maintained in the armory where deployment of such agent would occur in accordance with Administrative Directive 7.2, Armories.



D. <u>Decision Factors</u>. The decision to utilize chemical agents may consider among other factors the following:

| Directive Number | Effective Date | Page 6 of 14 |
|---|---|---|
| 6.5 | 2/13/2013 | |
| Title | | |
| | Use of Force | |

1. threat posed by the inmate (e.g., active aggression, presence of weapons, known history of assaultive behavior, inmate's non-compliance with lawful orders, etc.);
2. potential injury to staff and/or inmate;
3. area where agent shall be employed;
4. potential exposure or impact on uninvolved persons;
5. presence of a physical condition, medical or mental health concern, known to staff utilizing the chemical agent which may contraindicate use, (e.g., heart or respiratory condition, irregular breathing. etc.);
6. continuing refusal by an inmate to comply with a direct order; or,
7. an inmate's disciplinary history.

E. Contraindication of the Use of Chemical Agents. Prior to a planned use of physical force employing chemical agents and absent exigent circumstances, the inmate's health record shall be reviewed by a qualified health services staff member to determine whether the use of chemical agents on the inmate is medically contraindicated. The outcome of this consultation shall be documented on a medical incident report and in the inmate's health record.

F. Decontamination. Decontamination of any exposed person and the contaminated area shall be accomplished as soon as practical and consistent with the safe and secure operation of the facility upon restoration of control of the incident. Decontamination of any exposed person shall include at a minimum:

1. flushing of the eyes;
2. a shower and change of clothing;
3. medical attention; and,
4. removal of the person from the affected area if possible.

8. Restraints.

A. Authorized Use. Restraints as a use of physical force may be authorized to:

1. prevent escape;
2. prevent injury to others or self;
3. prevent property damage;
4. ensure compliance with an order; and,
5. maintain order, safety and security;

An inmate placed in restraints for a period longer than one (1) hour shall be placed on restrictive status in accordance with Administrative Directive 9.4, Restrictive Status. Use of restraints in accordance with Administrative Directives 6.4, Transportation and Community Supervision of Inmates, 9.4, Restrictive Status, or for routine movement shall not be considered a use of physical force under this Directive. Physical force shall not be used for the  harassment or punishment of any person.

B. In-Cell Restraints. The placement of an inmate on in-cell restraint status and the type of restraint used shall be approved by the Shift Commander or designee. The Shift Commander shall notify the Unit

| Directive Number 6.5 | Effective Date 2/13/2013 | Page 7 of 14 |
|---|---|---|
| Title | | |
| | Use of Force | |

Administrator or designee within one (1) hour of placement. Facts and circumstances leading to the use of in-cell restraints shall be documented on CN 6503, Restraint Checklist, and in accordance with Section 19 of this Directive. Placement shall also require completion of an incident report in accordance with Administrative Directive 6.6, Reporting of Incidents.



1. <u>Criteria</u>. The shift supervisor may use in-cell restraints as outlined in Section 8(A) of this Directive. Such application shall not be used as a punitive measure. Staff shall ensure that the application of the in-cell restraints allows the inmate to stand in an erect posture.

2. <u>Restraint Equipment</u>. Inmates on in-cell restraint status shall typically be restrained using handcuffs, leg irons and security (tether) chain.

3. <u>Application of Restraints</u>. Absent exigent circumstances, inmates on in-cell restraint status shall typically:

   a. be handcuffed in the front;
   b. have leg irons secured to the inmate's ankles; and,
   c. have a security (tether) chain attaching the leg irons to the handcuffs with a length that allows the inmate to stand erect.

4. <u>Cell Status and Authorized Items</u>. The inmate shall be on single cell status with all excess property removed with the exception of the following: mattress, bed linen, undershirt, underwear, socks, and jumpsuit tied around the waist. The Unit Administrator or designee may authorize the substitution of a safety gown for the jumpsuit.

5. <u>Video Recording</u>. This process shall be video recorded in accordance with Section 18 of this Directive. The video recording shall be utilized at a minimum, prior to placement (if feasible), during placement, during any notable change in behavior, and removal from in-cell restraints.

6. <u>Staff Observation and Review</u>. Staff shall observe the inmate, at a minimum, every 15 minutes or continuously if required by the Health Services Unit. Such observation checks shall be documented on CN 6503, Restraint Checklist. The Shift Commander or designee shall observe inmates on this status at least twice per shift. Health services staff shall observe the inmate at least twice in a 24-hour period and conduct a mental health assessment. The <u>Unit Administrator shall review</u> the restraint <u>status every 24 hours.</u> Should an inmate's continued non-compliant behavior result in the need for continued placement on in-cell restraints beyond 72 hours, the Unit Administrator shall determine authorization for continued placement. In addition, inmates who are on in-cell restraint status that fail to regain their composure, present a continuing threat to staff, self or others may be upgraded to full stationary restraint status in accordance with Section 8(C) of this Directive.

7. <u>Restraint Duration</u>. An inmate may remain on in-cell restraint status until the Shift Commander or designee determines that the use of in-cell restraints is no longer necessary to assure the safety of staff, the inmate and others and that the

| Directive Number | Effective Date | Page (8) of 14 |
|---|---|---|
| 6.5 | 2/13/2013 | |
| Title | | |
| Use of Force | | |

A   inmate's behavior no longer presents an increased risk of
interference with facility operations.

C.   Full Stationary Restraints. Use of full stationary restraints for
any purpose other than medical shall be in accordance with this
section and documented on CN 6503, Restraint Checklist and in
accordance with Section 19 of this Directive. Placement of an inmate
in full stationary restraints on a restrictive housing status shall
be authorized by the Shift Commander or designee. The Shift
Commander or designee shall notify the Unit Administrator or
designee within one (1) hour of placement. The Shift Commander or
designee shall review for release from restraints every two (2)
hours. Staff shall observe the inmate, at a minimum, every 15
minutes or continuously if required by the Health Services Unit. The
Unit Administrator shall review the inmate's status every eight (8)
hours and shall notify the appropriate District Administrator if the
restraint status continues beyond 24 hours.

1.   Criteria. The Shift Commander or designee may utilize full
stationary restraints to protect the inmate from imminent
self-injury or to protect the safety of staff or other
inmates. Prior to placement on full stationary restraints, the
Shift Commander or designee and a health services staff member
shall confer and gather relevant information about the inmate
and the immediate situation. If available, Mental Health staff
shall also be contacted to provide intervention prior to
placement on full stationary restraints, whenever possible.
Full stationary restraints shall be used as a last resort.

2.   Equipment. Normally, full stationary restraints shall be soft,
wide and flexible. However, when the Shift Commander or
designee reasonably believes that an inmate may compromise a
soft restraint device based on the inmate's history of
compromising such devices, metal mechanical restraints may be
used. The continued use of metal mechanical restraints for
this purpose shall be with notification and subsequent
authorization of the Unit Administrator, and shall require a
supplemental incident report, in accordance with
Administrative Directive 6.6, Reporting of Incidents.

3.   Cell Condition. Wherever possible, the surface that the
inmate is restrained to shall be placed in the middle of the
room away from the walls to prevent injury to staff and the
inmate during placement. The cell shall also be free of
obstructions to allow for clear observation of the inmate.

4.   Procedure. This process shall be video recorded in
accordance with Section 18 of this Directive. A video
recording shall be designated to each inmate while on full
stationary restraint status and the video recording shall be
utilized at a minimum, prior to placement (if feasible),
during placement, each (2) hour check, and during any notable
change in behavior and removal of restraints.

This procedure shall be implemented in collaboration with
health services staff. The inmate shall be placed on a
mattress that is positioned on top of a bed frame and the
inmate shall be positioned face up. Arms and legs shall be
restrained such that discomfort to the inmate is minimized. An

| Directive Number 6.5 | Effective Date 2/13/2013 | Page 9 of 14 |
|---|---|---|
| Title | | |
| Use of Force | | |

inmate shall be in appropriately clothed during the restraint period.

A post-incident medical evaluation shall be conducted upon placement and at the indicated intervals:

a. circulation – every 15 minutes;
b. respiration – every 15 minutes;
c. pulse – every 30 minutes;
d. blood pressure – every 60 minutes; and,
e. temperature – every 120 minutes.

These checks shall be executed and documented by health services staff in the inmate's health record. At least every two (2) hours the restraints shall be totally removed or sequentially removed one at a time and each limb of the inmate moved to full range of motion and assessed for trauma, blood circulation, and/or diminished nerve sensation.

The inmate shall be offered and allowed to attend to bodily functions at a minimum, every two hours. Restrained inmates shall receive normally scheduled meals. Meals shall be provided in bite-sized portions in an appropriate fashion (e.g., paper plate, paper bag, Styrofoam container, etc.) consistent with safety and security, unless a physician has ordered alternate dietary arrangements. If feasible, the inmate may have one (1) arm released to use for feeding. Fluids shall be offered every two (2) hours. Food and fluid intake/output and refusal shall be documented. Immediate removal of restraints shall be initiated where a decompensating physical condition of a restrained inmate contraindicates restraints. In such circumstances, the physician shall be notified immediately.

Normally, full stationary restraints shall be soft, wide and flexible. However, in the event that an inmate compromises the soft restraints, metal mechanical restraints may be used. The use of metal mechanical restraints for full stationary restraint shall be with the permission of the Unit Administrator, and shall require a supplemental incident report, in accordance with Administrative Directive 6.6, Reporting of Incidents.

Any device used for full stationary restraint of an inmate shall require prior written authorization from the Commissioner of Correction or designee.

D. <u>Restricted Use</u>. Any restraint device or restraint technique not specifically enumerated in this Directive shall not be authorized.

9. <u>Therapeutic Restraints</u>. Therapeutic restraints shall be used only in situations that are directly proportionate to the presence of imminent physical danger to the inmate, others or the physical surroundings in accordance with Attachment A, CMHC/UCHC Policy on Therapeutic Restraints. In any unit designated as a housing unit for the mentally ill, the only full stationary restraints authorized are therapeutic restraints.

| Directive Number | Effective Date | Page 10 of 14 |
|---|---|---|
| 6.5 | 2/13/2013 | |

| Title | |
|---|---|
| | Use of Force |

A.  No On-Site Health Services Staff. When on-site health services staff are not available, only soft restraints shall be used as therapeutic restraints. The placement shall require an order from the on-call psychiatrist or physician within one (1) hour.

B.  On-Site Health Services Staff. An order to restrain shall be subsequent to an evaluation by a physician. If a physician is not on-site, an assessment shall be made by a registered nurse with a telephone order obtained within one (1) hour from a physician and so documented. The physician may discontinue restraints subsequent to a direct evaluation. In the absence of a physician, a registered nurse may discontinue restraints with a telephone order from a physician.

C.  Equipment. Restraint equipment shall be soft, wide and flexible. Any deviation to this requirement shall require the approval of the Director of Health and Addiction Services.

D.  Cell Condition. Wherever possible, the authorized restraint bed shall be placed in the middle of the room away from the walls to prevent injury of staff and inmates during placement. The cell shall also be free of obstructions to allow for clear observation of the inmate.

E.  Procedure. This process shall be video recorded in accordance with Section 18 of this Directive. A video recording shall be designated to each inmate while on therapeutic restraint status and the video recording shall be utilized at least during placement, each (2) hour check, during any notable change in behavior and removal of restraints. This procedure shall be implemented in collaboration with supervising custody staff. The inmate shall be placed on a mattress, which is positioned on top of a bed frame and the inmate shall be positioned face up. Arms and legs shall be restrained such that discomfort to the inmate is minimized.

A post-incident medical evaluation shall be conducted upon placement and at the indicated intervals:

1.  circulation – every 15 minutes;
2.  respiration – every 15 minutes;
3.  pulse – every 30 minutes;
4.  blood pressure – every 60 minutes; and,
5.  temperature – every 120 minutes.

These checks shall be executed and documented by health services staff in the inmate's health record. At least every two (2) hours the restraints shall be totally removed or sequentially removed one at a time and each limb of the inmate moved to full range of motion and assessed for trauma, blood circulation, and/or diminished nerve sensation.

The inmate shall be offered and allowed to attend to bodily functions at a minimum, every two hours. Restrained inmates shall receive normally scheduled meals. Meals shall be provided in bite-sized portions in an appropriate fashion (e.g., paper plate, paper bag, Styrofoam container, etc.) consistent with safety and security, unless a physician has ordered alternate dietary arrangements. If feasible, the inmate may have one (1) arm released to use for feeding. Fluids shall be offered every two (2) hours. Food and fluid intake/output and refusal shall be documented. Immediate removal of

| Directive Number 6.5 | Effective Date 2/13/2013 | Page 11 of 14 |
|---|---|---|
| Title | Use of Force | |

restraints shall be initiated where a decompensating physical condition of a restrained inmate contraindicates restraints. In such circumstances, the physician shall be notified immediately.

    F.    <u>Clothing/Covering</u>. An inmate placed on therapeutic restraint status shall be appropriately clothed or covered in accordance with Attachment A, CMHC/UCHC Policy on Therapeutic Restraints.

10.    <u>Universal Precaution Safety Veil</u>. The Shift Commander or designee may authorize the use of a Universal Precaution Safety Veil when an inmate has:

    A.    demonstrated an immediate threat to staff safety by spitting on or at staff or others; or,

    B.    a history of threatening or engaging in spitting.

The use of a Universal Precaution Safety Veil shall only be authorized for the duration of the threat and shall require notification to the Unit Administrator and health services staff. No inmate shall be left in full stationary restraints when wearing a Universal Precaution Safety Veil. Use of a Universal Precaution Safety Veil shall require an incident report in accordance with Administrative Directive 6.6, Reporting of Incidents.

11.    <u>Training</u>. Custody staff training shall be in accordance with Administrative Directives 2.7, Training and Staff Development and 9.4, Restrictive Status. Health services staff training shall be in accordance with Administrative Directives 2.7, Training and Staff Development, 8.5, Mental Health Services and 8.6, Credentials of Health Service Staff.

12.    <u>Firearms</u>. Use of firearms with lethal ammunition may be used as authorized in accordance with Section 6 of this Directive. Use of firearms with less-than-lethal ammunition may be used in accordance with Sections 5 and 6 of this Directive. Warning shots shall not be authorized. A firearm shall not be used if discharging it could reasonably be expected to endanger the life of any innocent bystander.

13.    <u>Barricade Obstruction Tool</u>. After proper training and certification, Barricade Obstruction Tool may be authorized by the Shift Commander or designee to dislodge or remove any item that has been intentionally used by an inmate to obstruct a clear view of or prevent access to the interior of a cell including, but not limited to, barricading or otherwise covering the door, window or trap door. Care shall be taken by the employee not to intentionally strike the inmate with the Barricade Obstruction Tool while attempting to dislodge or remove such obstruction. The Barricade Obstruction Tool may also be utilized to facilitate the introduction of chemical agent into a cell as authorized in section 7 of this Directive. Use of a Barricade Obstruction Tool must be documented on CN 6502 Use of Firearms, Impact Weapons or Oleoresin Capsicum Report and CN 6604 Incident Summary Report (1, 2 and 3).

14.    <u>Baton</u>. A PR-24 or an expandable control device may only be used by a current, trained member of the Tactical Operations Unit, Canine Unit, Parole and Community Services Division, or Security Division in accordance with Sections 5 and 6 of this Directive.

15.    <u>Canine as a Use of Force</u>. A canine may be deployed as an authorized use of physical force consistent with this Directive and Administrative Directive

| Directive Number 6.5 | Effective Date 2/13/2013 | Page 12 of 14 |
|---|---|---|
| Title | Use of Force | |

6.11, Canine Unit. Authorization to use a canine team where use of physical force is anticipated shall be approved by the Unit Administrator. Canine handlers may proceed without such authorization only when there is a clear and imminent danger to the safety of staff and/or inmates.

Canine as a use of physical force in the extraction of an inmate from a cell shall only be authorized when there is an imminent threat to the life of staff, inmates and/or the public. Such use of a canine shall require the authorization of the Unit Administrator or higher authority.

16.   Cell Extraction. Cell extractions shall be conducted in accordance with each facility's emergency procedures. Use of canines during a cell extraction shall be in accordance with section 15 of this Directive.

17.   Shield. A shield may be authorized by the Shift Commander or designee in accordance with Section 5 of this Directive.

18.   Medical Examination. A post-incident medical evaluation and treatment shall be provided as soon as possible after the use of physical force and as appropriate.

19.   Video Recording. A planned use of physical force within a facility shall be video recorded by a trained operator in accordance with Administrative Directive 7.3, Emergency Plans. The camera operator shall state identity of the operator, date, time and location of the recording. The camera shall be continuously operated and focus on the central point of action avoiding any obstruction of view consistent with safety and security. Any break in the video recording of the incident shall require reintroduction of the operator, date, time, location, and reason for and duration of the break in recording. Any movement within the facility of the inmate in conjunction with and directly related to the use of physical force incident shall also be video recorded.

The video recording shall be properly labeled to include the facility, location, date, time, subject of the recording, and identity of the operator. The original recording shall be properly secured and maintained for a minimum of ten (10) years, or longer if required by pending litigation or other investigative, administrative or court proceedings in accordance with Administrative Directive 4.7, Records Retention. The original recording shall be considered physical evidence in accordance with Administrative Directive 6.9, Control of Contraband and Physical Evidence. Any movement, relocation or disposal of the original recording shall be authorized only by the Unit Administrator. The original recording shall be numbered as "#1" and copies shall be sequentially numbered. All recordings shall be properly accounted for.

Video recordings shall be treated as evidence and handled in accordance with Administrative Directive 6.9, Control of Contraband and Physical Evidence. Each video recording shall have a separate CN 6901, Physical Evidence Tag and Chain of Custody Form. A manager/supervisor not directly involved in the incident shall review the recording and complete CN 6902, Supervisor Video Recording Review.

20.   Reporting and Record Keeping. Whenever physical force is used CN 6501, Use of Force Report shall be completed by each employee involved in or observing the use of physical force incident. This requirement shall not apply to the routine use of restraints which is not considered a use of

| Directive Number 6.5 | Effective Date 2/13/2013 | Page 13 of 14 |
|---|---|---|
| Title | Use of Force | |

physical force. In addition to CN 6501, Use of Force Report, CN 6502, Use of Firearms, Impact Weapons or Chemical Agents shall be completed for any circumstance where chemical agent is deployed. These reports shall be attached to the incident report and submitted as required in Administrative Directive 6.6, Reporting of Incidents.

21.   Serious Incident Review. A Serious Incident Review shall be used to assess the appropriateness of a use of physical force in an incident.

A.   Circumstances. A Serious Incident Review shall be conducted whenever:

1.   a firearm is discharged;
2.   Category II chemical agents are used; and/or,
3.   a firearm is drawn in a community setting except by staff of the Tactical Operations Unit, Security Division or Parole and Community Services Division, in the performance of their duties and in accordance with required training, while assisting outside law enforcement with an inmate apprehension.

B.   Review Committee. A Serious Incident Review Committee shall be appointed within five (5) business days of the incident by the appropriate division head or designee whose unit was involved in the incident. The committee shall consist of three (3) persons of managerial or supervisory rank. The Committee chairperson shall be of the rank of deputy warden, parole manager or above. No member of the review committee shall be from the unit where the incident took place.

C.   Committee Activities and Report. The committee shall review and analyze all reports, examine any physical evidence and may interview any witnesses or participants. The committee shall issue a report describing:

1.   whether the action taken was consistent with Department policy;
2.   whether other, less severe means of physical force were available to resolve or prevent the incident;
3.   what action should be taken to avoid such future incidents; and,
4.   any recommended changes in Department or unit policy. The committee's final report shall be prepared within 30 days of the incident.

D.   Report Review. Within five (5) business days, the Deputy Commissioner of Operations shall submit a report and supporting documentation with comments and action taken to the Commissioner of Correction. Upon final disposition, the report shall be maintained by the Commissioner of Correction or designee.

22.   Emergency Circumstances. Nothing in this Directive shall preclude a shift supervisor from authorizing a use of physical force in an emergency situation to prevent significant injury to an inmate, another person, or damage to property that raises security concerns. Nothing in this Directive shall prevent an employee from taking immediate, reasonable action to protect self or others.

| Directive Number 6.5 | Effective Date 2/13/2013 | Page 14 of 14 |
|---|---|---|
| Title | Use of Force | |

23.   Forms and Attachments. The following forms and attachments are applicable to this Administrative Directive and shall be utilized for the intended function:

   A.   CN 6501, Use of Force Report;

   B.   CN 6502, Use of Firearms, Impact Weapons or Chemical Agents;

   C.   CN 6503, Restraint Checklist; and,

   D.   Attachment A, CMHC/UCHC Policy on Therapeutic Restraints.

24.   Exceptions. Any exceptions to the procedures in this Administrative Directive shall require prior written approval from the Commissioner of Correction.

| State of Connecticut Department of Correction | Directive Number 2.17 | Effective Date 09/26/14 | Page 1 of 7 |
|---|---|---|---|
| **ADMINISTRATIVE DIRECTIVE** | Supersedes | Employee Conduct dated 6/3/2013 | |
| Approved By *[signature]* Interim Commissioner Scott Semple | Title | Employee Conduct | |

1. <u>Policy</u>. Each employee of the Department of Correction shall engage in appropriate and ethical conduct while carrying out official duties and while engaged in off duty activities which directly reflect on the Department.

2. <u>Authority and Reference</u>.

   A. Public law 108-79. Prison Rape Elimination Act of 2003.
   B. 28 C.F.R. 115, Prison Rape Elimination Act National Standards.
   C. United States Code, 5 USC 1501 through 1508 (Hatch Act).
   D. Connecticut General Statutes, Sections 1-79 through 1-80, 1-81 through 1-86, 1-86e through 1-89, 5-266a through 5-268, 18-81,21a-267(d) 53a-65, 53a-71, 53a-73a, 53a-174 and 53a-174b.
   E. Public Act 11-71, An Act Concerning the Penalty for Certain Non-Violent Drug Offenses.
   F. Administrative Directives 1.10, Investigations; 1.12, Employee Legal Counsel/Representation; 1.13, Code of Ethics; 2.1, Equal Employment Opportunity and Affirmative Action; 2.2, Sexual Harassment; 2.6, Employee Discipline; 2.11, Employee Dependability; 6.12 Inmate Sexual Abuse/Sexual Harassment Prevention and Intervention; 9.6, Inmate Administrative Remedies; and 10.7, Inmate Communications.
   G. American Correctional Association, Standards for Administration of Correctional Agencies, Second Edition, April 1993, Standards 2-CO-1A-29, 2-CO-1C-01, 2-CO-1C-04, 2-CO-1C-11 and 2-CO-1C-20.
   H. American Correctional Association, Standards for Adult Correctional Institution, Fourth Edition, January 2003, Standards 4-4024, 4-4048, 4-4056, 4-4063 and 4-4069.
   I. American Correctional Association, Performance-Based Standards for Adult Local Detention Facilities, Fourth Edition, June 2004, Standards 4-ALDF-7E-21, 4-ALDF-7C-01 and 4-ALDF-7C-02.
   J. American Correctional Association, Standards for Adult for Probation and Parole Field Services, Third Edition, August 1998, Standards 3-3032, 3-3047, 3-3053, 3-3060 and 3-3068.
   K. American Correctional Association, Standards for Correctional Training Academies, First Edition, May 1993, Standards 1-CTA-1C-01, 1-CTA-1C-07, 1-CTA-1C-12 and 1-CTA-1C-14.

3. <u>Definitions and Acronyms</u>. For the purposes stated herein, the following definitions and acronyms apply:

   A. <u>CD</u>. Compact Disc.
   B. <u>DOC</u>. Department of Correction.
   C. <u>DVD</u>. Digital Video Disc.
   D. <u>Electronic Devices</u>. Any personal electronic wireless communication device to include but not limited to a cell phone, pager, blackberry, or personal digital assistant (PDA).
   E. <u>Immediate Family Member</u>. A spouse, parent or step parent, child or stepchild, grandparent or step grandparent, sibling or stepsibling, grandchild or step grandchild, or cohabitant.
   F. <u>Inmate</u>. An individual under the supervision of the Department of Correction, or having any continuing sentence under the Department's supervision including but not limited to parole or community supervision.

| Directive Number 2.17 | Effective Date 09/26/14 | Page 2 of 7 |
|---|---|---|
| Title | Employee Conduct | |

G.   MP3. An audio format for consumer audio storage and playback of music on digital audio players.

H.   PDA. Personal Digital Assistant.

I.   PREA. Prison Rape Elimination Act.

J.   Sexual Abuse. For the purposes of this directive, Sexual Abuse shall be defined in accordance with Section 3 of A.D. 6.12 Inmate Sexual Abuse/Sexual Harassment Prevention and Intervention.

4.   Employee Responsibility. Each employee of the Department shall act in a professional, ethical and responsible manner. Each employee shall become familiar with the tables of organization depicting the Department and Unit chains of command. Each employee shall show respect to any ranking member of the Department and shall obey any lawful order of a supervisor. An employee given an instruction or order which conflicts with a previous instruction or order shall inform the present supervisor of the conflict and follow the order as directed. Questions regarding any of the provisions contained in this Directive shall be directed to the employee's Unit Administrator or designee.

5.   Standards of Conduct.

A.   Each employee shall:

1.   Maintain compliance with all PREA Standards.

2.   Comply with all federal and state statutes and regulations, administrative and unit directives, department and unit policies and procedures, post orders and lawful orders/instructions.

3.   Enforce all rules, regulations and policies of the Department as appropriate.

4.   Ensure that a safe, secure and sanitary work environment is maintained.

5.   Remain alert, aware of, and responsive to the surroundings at all times.

6.   Remain on assigned post until properly relieved and/or remain at worksite as required. No employee shall be authorized to leave facility grounds without authorization from a supervisor.

7.   Comply with official notices and roll call and other instructions.

8.   Meet all employee responsibilities for dependability.

9.   Report any arrest or receipt of any criminal summons, any charge of infraction of C.G.S. 21a-267(d) (Prohibited Acts re: Drug Paraphernalia) and/or any protective or restraining order received from a law enforcement agency or court, to an appropriate supervisor prior to returning to work or within 48 hours (whichever occurs first). Such violations are subject to investigation in accordance with A.D. 1.10. This requirement shall not apply to summons received for minor traffic violations. An employee shall submit supporting documentation of arrest, or receipt of summons. Employees who have been arrested must inform their supervisor of the disposition of their charges within 48 hours of a disposition being reached (to include, but not limited to, convictions, dismissal of charges, nolles, accelerated rehabilitation, probation, suspended sentences, continued without finding, payment of fines, and special terms and conditions of the court). The employee must also submit supporting documentation of the disposition within 48 hours after disposition. Any employee on extended leave shall report any arrest or receipt of summons,

| Directive Number 2.17 | Effective Date 09/26/14 | Page 3 of 7 |
|---|---|---|

| Title |
|---|
| Employee Conduct |

and subsequent disposition, to the Unit Administrator within 48 hours.

10. Report the receipt of any civil summons that impacts employment (e.g., named as a defendant in an employee or inmate lawsuit, restraining order, capias, contempt of court, etc.) associated with the employee's duties to an appropriate supervisor on or by the next scheduled work day, but no later than 48 hours after receipt of the summons.

11. Provide the Office of the Attorney General with relevant documents, subpoenas or other materials related to legal action with which they are involved in accordance with Administrative Directive 1.12, Employee Legal Counsel/Representation. Staff shall cooperate in all inquiries, depositions, interrogatories, or other legal processes that will assist the Legal Affairs Office and/or the Office of the Attorney General.

12. Inform the appropriate supervisor and the Human Resources Unit, in writing, of any change of address and/or telephone number within 48 hours.

13. Report to an appropriate supervisor any condition or use of medication the employee is taking, that may affect job performance or judgment.

14. Report any medication brought into the worksite and maintain any personal property and medication in a secure manner.

15. Act in a professional manner showing respect to other employees and the public.

16. Respect and protect the rights of inmates.

17. Maintain good stewardship of all state property and equipment.

18. Maintain appropriate demeanor at all times.

19. Be courteous and accommodating in all dealings with the public, to include telephone etiquette.

20. Report, in writing, to a supervisor when a friend or relative is or becomes incarcerated in any Connecticut DOC facility within 48 hours of discovery.

21. Cooperate fully and truthfully in any inquiry or investigation conducted by the Department of Correction and/or any law enforcement, regulatory or state agency.

22. Appropriately file information as required by the State Ethics Commission in accordance with Administrative Directive 1.13, Code of Ethics.

23. Promptly report to a supervisor any threat, harassment, physical or verbal abuse, assault, or act of intimidation. Incidents of discrimination or sexual harassment shall be reported in accordance with Administrative Directives 2.1, Equal Employment Opportunity and Affirmative Action and 2.2, Sexual Harassment.

24. An employee must receive written authorization from his/her Unit Administrator and the Unit Administrator housing the incarcerated family member in order to visit, phone or correspond with such family member.

B. The following behavior shall be strictly prohibited:

1. Any act that jeopardizes the security of the unit, health, safety, or welfare of the public, employees or inmates.

2. Excessive or unnecessary use of force.

3. Unauthorized possession of non-department issued firearms or other weapon while on duty or state property.

4. Conveyance or possession of unauthorized items within, into or out of a facility, or other correctional unit.

5. Neglect of duty or failure to supervise.

| Directive Number 2.17 | Effective Date 09/26/14 | Page 4 of 7 |
|---|---|---|

| Title |
|---|
| Employee Conduct |

6.    Sleeping or inattentiveness while on duty.

7.    Possessing unauthorized items while on duty (e.g., reading materials, personal electronic devices, etc.).

8.    Abuse of sick time, accrued leave or workers' compensation.

9.    Reporting to work in an impaired condition as a result of the use of alcohol, an illegal drug, or any medication. Employees shall not consume alcohol while on duty or in uniform.

10.   Entering a correctional unit when off duty unless previously authorized.

11.   Engaging in abusive, obscene, threatening, intimidating language or behavior.

12.   Engaging in unprofessional or illegal behavior, both on and off duty that could reflect negatively on the Department of Correction or conflict with the Department's mission, to include association or membership with security risk groups, criminal enterprises, hate groups, or groups of high interest to law enforcement. It shall be the employee's responsibility to seek written clarification from the Unit Administrator regarding such association or membership.

13.   Engaging in any activity, which would conflict with the proper discharge of or impair the independence of judgment in the performance of duty.

14.   Engaging in bartering, gambling or games of chance with inmates.

15.   Engaging in retaliation or reprisal (to include coercion or threatening behavior) against an inmate for participating in activities that are protected by law or directive. Such protected activities include, but are not limited to:

    a.    filing an appeal, grievance or property claim in accordance with Administrative Directive 9.6, Inmate Administrative Remedies;

    b.    accessing courts; and,

    c.    engaging in privileged correspondence in accordance with Administrative Directive 10.7, Inmate Communications.

16.   Engaging in undue familiarity with inmates which includes, but shall not be limited to, the following:

    a.    any sexual contact between an employee and an inmate and/or person under the Department's supervision, or continuing sentence under the Department's supervision including but not limited to parole or community supervision;

    b.    sexualizing a situation without physical touching such as partaking in activities involving suggestive or pornographic photographs, suggestive or explicit letters or behavior which provides sexual gratification;

    c.    personal involvement in an inmate's private or family matters outside assigned professional duties;

    d.    performing personal favors for inmates outside assigned professional duties;

    e.    discussing with an inmate any matter pertaining to the inmate's crime(s) or the crime(s) of other inmates (except as required pursuant to official business);

    f.    discussing with an inmate personal and/or business matters of employees;

    g.    discussing security operations of a facility with an inmate;

| Directive Number 2.17 | Effective Date 09/26/14 | Page 5 of 7 |
|---|---|---|

| Title |
|---|
| Employee Conduct |

    h.   inconsistently enforcing facility rules to favor an inmate or group of inmates over other inmates or groups of inmates;

    i.   having personal work done by an inmate;

    j.   visiting, corresponding with or accepting telephone calls, personal notes or letters from an inmate who is under the custody of the Department (except for an immediate family member AND only when authorized in writing by the employee's Unit Administrator and the Unit Administrator of the facility where the immediate family member is incarcerated);

    k.   housing an inmate who is under the custody of the Department (to include an inmate on community supervision), at the employee's home (except for an immediate family member AND when authorized in writing by the employee's Unit Administrator and the Director of Parole and Community Services);

    l.   entering into a personal or business agreement with an inmate, including, but not limited, to acting as a bail bondsman for an inmate or providing the resources for the inmate to bond out without prior notification to the Unit Administrator; and,

    m.   Transporting an inmate to an unauthorized location.

17.   Engaging in behavior which is sexually, emotionally, or physically abusive or harassing toward the public, employees or inmates.

18.   Unauthorized appropriation or use of any property belonging to the public, state or an inmate for personal, political or union purposes (i.e., computers, electronic mail, Department letterhead, etc.).

19.   Release of any confidential information or unauthorized or inaccurate release of information, records, or documents.

20.   Falsification, unauthorized alteration, or destruction of documents, log books, and other records, including job applications.

21.   Use of official position, uniform, identification or badge to gain any personal advantage or an advantage for another in any improper or unauthorized manner.

22.   Engaging in conduct that constitutes, or gives rise to, the appearance of a conflict of interest.

23.   Unauthorized acceptance of any item or service for oneself or family members, including but not limited to, a gift, loan, political contribution, reward or promise of future employment as outlined in Administrative Directive 1.13, Code of Ethics.

24.   Engage in any political activities that conflict with state and federal laws to include the Hatch Act.

25.   Failure to follow a lawful order.

26.   Engaging in insubordination.

27.   Failure to cooperate with a Department investigation.

28.   Lying or giving false testimony during the course of a Department investigation.

29.   Intentionally withholding information necessary for the completion of an investigation.

30.   Failure to properly conduct tours and/or inmate counts.

31.   Engaging in behavior to include lying or spreading false rumors that purposely defame the character of an employee, the public or the Department.

| Directive Number<br>2.17 | Effective Date<br>09/26/14 | Page 6 of 7 |
|---|---|---|

| Title |
|---|
| Employee Conduct |

    32.  Engaging in any behavior or activity prohibited by Administrative Directives 2.1, Equal Employment Opportunity and Affirmative Action and 2.2, Sexual Harassment.

    33.  Engaging in retaliation, coercion, intimidation, harassment, threats or discrimination against any employee.

    34.  Conveying or possessing the following in a correctional facility unless authorized in writing by the Unit Administrator or higher authority:

        a.  any personal electronic wireless communication device (to include, but not limited to, a cellphone, pager, blackberry device, personal digital assistant (PDA));

        b.  any audio recording or playback device (to include, but not limited to, a radio, tape/CD player, ipod or MP3 player); or,

        c.  any photographic/video recording or playback device (to include, but not limited to, a television, DVD player, ipod, MP3 player, or electronic/video game).

6.   <u>Staff Discipline</u> In accordance with Administrative Directive 2.6 staff shall be subject to disciplinary sanctions up to and including termination for violating agency inmate sexual abuse or harassment policies. Termination is the presumptive disciplinary sanction for staff that have been found to have engaged in sexual abuse. All terminations for violations of agency inmate sexual abuse or harassment policies or resignations by staff who would have been terminated but for their resignation shall be reported to law enforcement agencies, unless the activity was clearly not criminal, and to any relevant licensing bodies.

7.   <u>Supervision of Family Members</u>. An employee shall not be employed in any position that places the employee above or under the chain of command or possible supervision of any immediate family member as defined in Section 3(A), nor shall the employee be placed above or under the chain of command or possible supervision of any immediate family member of the employee's spouse or cohabitant. Such relationships must be reported by the family member of higher rank, in writing, to the Unit Administrator.

A relationship between family members who are not immediate family as defined in Section 3(A) of this Directive may preclude placement of an employee in a chain of command. Such relationships shall be evaluated by the appropriate Division Head on a case by case basis.

8.   <u>Staff Relationships</u>.

    A.  <u>Supervisor/Employee Relationships</u>. Any supervisor or manager who becomes romantically or intimately involved with a Department employee in the chain of command must report such relationship so that the Department can take appropriate actions to ensure assignments do not result in a conflict of interest or possible supervision. The supervisor or manager involved in the relationship must report such relationship, in writing, to the Unit Administrator. Failure to do so shall result in discipline.

    B.  <u>Employee/Employee Relationships</u>. Employees who become romantically or intimately involved with one another shall be required to maintain a professional demeanor while on duty or on state property. It shall be the employees' responsibility to ensure said relationship does not affect their ability to carry out the duties and responsibilities of their respective positions.

    C.  <u>Outside Business Relationships</u>. An employee who owns or runs an outside business shall be prohibited from employing any supervisor or

| Directive Number 2.17 | Effective Date 09/26/14 | Page 7 of 7 |
|---|---|---|
| Title | Employee Conduct | |

subordinate in his/her chain-of-command. Conversely, an employee shall be prohibited from working for any supervisor or subordinate in his/her chain-of-command who owns or runs an outside business.

9. <u>Reporting Policy and/or Conduct Violations</u>. Each employee shall report to a supervisor or appropriate personnel any policy violation or breach of professional conduct involving the public, employees or inmates under the jurisdiction of the Department of Correction.

10. <u>Exceptions</u>. Any exceptions to the procedures in this Administrative Directive shall require prior written approval from the Commissioner.

# – EXHIBIT–#9

1) ADMINISTRATIVE DIRECTIVE 10.8 Religious Services

| | | Directive Number<br>10.8 | Effective Date<br>9/14/2014 | Page 1 of 7 |
|---|---|---|---|---|
| | State of Connecticut<br>Department of Correction | | | |
| | ADMINISTRATIVE<br>DIRECTIVE | Supersedes<br>   Religious Services, dated 6/15/2011 | | |
| Approved By<br><br>Interim Commissioner Scott Semple | | Title<br>         Religious Services | | |

1.   Policy. The practice of religion by inmates in accordance with the
     provisions of this Directive shall be consistent with the compelling
     governmental interest of preventing inmate conduct, which threatens
     security, safety and order.

2.   Authority and References.

     A.   Public Law 108-79, Prison Rape Elimination Act of 2003.
     B.   28 C.F.R. 115, Prison Rape Elimination Act National Standards
     C.   Connecticut General Statutes, Sections 18-81 and 52-571b.
     D.   Administrative Directives 6.1, Tours and Inspections; 6.10, Inmate
          Property; 6.12, Inmate Sexual Abuse/Sexual Harassment Prevention and
          Intervention; 9.4, Restrictive Status; 10.7, Inmate Communications;
          10.13, Offender Programs; and 10.18, Nutrition and Food Services.
     E.   American Correctional Association, Standards for the Administration
          of Correctional Agencies, Second Edition, April 1993, Standard 2-CO-
          5E-01.
     F.   American Correctional Association, Standards for Adult Correctional
          Institutions, Fourth Edition, January 2003, Standards 4-4319 and 4-
          4512 through 4-4521.
     G.   American Correctional Association, Performance-Based Standards for
          Adult Local Detention Facilities, Fourth Edition, June 2004,
          Standards 4-ALDF-4A-10 and 4-ALDF-5C-17 through 4-ALDF-5C-24.
     H.   American Correctional Chaplain Association Code of Ethics.

3.   Definitions and Acronyms. For the purposes stated herein, the following
     definitions and acronyms apply:

     A.   Associate Chaplain. A chaplain with supervisory responsibilities
          over other chaplains of a lower grade, as designated by the Director
          of Religious Services.
     B.   Chaplain. A minister, priest, imam, rabbi, or other leader of a
          religious denomination who is authorized by the Department of
          Correction to perform religious functions for inmates.
     C.   Collective Religious Activity. Religious activity which involves two
          (2) or more inmates and which generally, but not necessarily
          requires the commitment of specifically designated Department of
          Correction facilities or staff for the religious activity to take
          place.
     D.   Common Fare. A diet which meets all nutritional requirements as
          determined by a Department of Correction licensed dietician, without
          the presence of food items forbidden by religious dogma.
     E.   Director of Religious Services. The chaplain responsible for the
          facilitation and oversight of religious programming within the
          Department.
     F.   Disqualifying Custody Conditions. A classification determination
          that an inmate's participation in collective religious activity

| Directive Number 10.8 | Effective Date 9/14/2014 | Page 3 of 7 |
|---|---|---|
| Title | Religious Services | |

and group counseling, religious study classes and adherence to dietary requirements. In determining what constitutes legitimate religious practices, the Director of Religious Services should consider whether there is a body of literature stating principles that support the practices and whether the practices are recognized by a group of persons who share common ethical, moral or intellectual views. For institutional safety and security, all recommendations for religious practices shall require approval of the Deputy Commissioner of Operations or designee in consultation with the Director of Religious Services.

E.  All chaplains shall serve the spiritual and pastoral needs of all inmates. They shall exercise their ministry without influencing individuals to change their religious preference or faith. Professionalism and safety and security considerations require that they conduct their ministry without communicating derogatory attitudes toward other faiths. They are responsible for ministry to inmates regardless of religious beliefs or affiliation.

F.  An inmate may claim only one religion at a time, by completing CN 100801, Request for Designation of Religion. An inmate shall not be required to choose a religion, and may choose no religion at all.

An inmate may designate a change of religion not less than 90 consecutive calendar days from the date that his/her current religious designation became effective. The 90-day requirement shall remain in effect regardless of any change in facility.

New inmates who designate a religion, for which there is collective activity, shall be placed on collective religious activity lists as soon as possible. To achieve this, as part of the admission process for all new inmates, a copy of the inmate's signed, current CN 100801, Request For Designation of Religion shall be forwarded to the Institutional Religious Facilitator. The original shall be maintained in Section 6 of the inmate's master file.

The inmate must observe the 90-day requirement when requesting a change in religious affiliation. The inmate shall submit a written notification using CN 100801, Request for Designation of Religion to the Institutional Religious Facilitator. If more than 90 consecutive calendar days have elapsed since the inmate's current religious designation became effective, the Institutional Religious Facilitator or designee shall confirm the change (which shall take effect on the last Monday of the month only) and return a copy of the completed form to the inmate. If fewer than 90 consecutive calendar days have elapsed since the inmate's current religious designation became effective, the Institutional Religious Facilitator or designee shall return the form to the inmate advising the inmate to resubmit once the 90-day requirement has been fulfilled. A copy of the completed form shall be placed in the inmate's master file as well as provided to the inmate.

There must be a current form CN 100801, Request for Designation of Religion, on file for each inmate, even if an inmate does not choose a religion that has collective religious activity, chooses no religion or refuses to sign the form. If an inmate refuses to sign form CN 100801, Request for Designation of Religion, the staff person shall note that fact on the form. The staff person shall sign, date the form, process it and distribute appropriate copies.

| Directive Number 10.8 | Effective Date 9/14/2014 | Page 5 of 7 |
|---|---|---|

| Title | Religious Services |
|---|---|

  warranted by inmate interest and if consistent with institutional
  security and resources.

B.  All collective religious activity shall be conducted and supervised
    by a Department authorized chaplain or religious volunteer who
    professes the same religion as the group gathering together. An
    inmate may not conduct a collective religious activity under any
    circumstances.

C.  The Unit Administrator shall assign facility security staff as
    appropriate.

D.  An inmate may assist a Department authorized chaplain or religious
    volunteer who is conducting a collective religious activity. An
    inmate can never be authorized to serve as a chaplain or religious
    leader. An inmate can never exercise any authority over any other
    inmate.

E.  There shall be no demonstrative public individual prayer that would
    disrupt the orderly operation of the institution, such as in the
    work or school area, recreation area, day room, etc. All such prayer
    must be done privately in one's cell or by one's bed.

F.  When it is considered necessary for the security and order of the
    institution, the facility Unit Administrator may limit or prohibit
    attendance at, discontinue, or not approve a religious activity,
    provided that any such limitation, prohibition, discontinuation or
    disapproval is in furtherance of a compelling governmental interest
    and is the least restrictive means of furthering that compelling
    governmental interest.

7.  Director of Religious Services. The Director of Religious Services shall:

A.  Supervise administration of this Directive within the Department.

B.  Oversee the appointment of Institutional Religious Facilitators and
    salaried, contracted or authorized volunteer chaplains.

C.  Serve as a resource person for all matters pertaining to religion.

D.  Conduct religious programs and services as appropriate.

E.  Recommend to the Commissioner or designee each current religious
    service or program for re-approval or denial.

F.  Recommend to the Commissioner or designee each new request for
    current religious service or program for approval or denial.

G.  Establish, in consultation with the Commissioner or designee, job
    duties and assignments for the positions of Director of Religious
    Services, Associate Chaplain, Institutional Religious Facilitator
    and Chaplain. Ensure compliance with such duties and assignments.

8.  Associate Chaplain. An Associate Chaplain shall:

A.  Provide supervision for all chaplains in a lower grade in one's own
    institution and for other chaplains in a lower grade in other
    institutions, as assigned by the Director of Religious Services.

B.  Serve as a religious resource to the Director of Religious Services.

C.  The Director of Religious Services shall assign an Associate
    Chaplain to attend the staff meeting of the District Administrator.
    This chaplain shall serve as a resource to the District
    Administrator and also as the liaison between the District
    Administrator and the Director of Religious Services.

D.  Perform other duties as needed by the Religious Services Unit.

9.  Chaplains. A chaplain, when engaged, shall provide or make arrangements
    for the services of religious faiths and shall serve the spiritual and

| Directive Number | Effective Date | Page 7 of 7 |
|---|---|---|
| 10.8 | 9/14/2014 | |

| Title |
|---|
| Religious Services |

14. **Religious Services Food Policy.** For health, safety and facility security reasons, all food necessary for essential religious worship services and programs shall be provided exclusively through the Department's Food Services Unit in accordance with Administrative Directive 10.18, Nutrition and Food Services, or may be available for purchase through the commissary. No outside food or beverages shall be permitted within the facility.

15. **Use of Media in Religious Programming.** All media used in religious programming must be authorized by the Director of Religious Services or designee prior to use in accordance with Administrative Directive 10.13, Offender Programs. All requests to use media must be submitted on form CN 101303, Media Information and Request to View Form. Review may include referral to the Media Review Board in accordance with Administrative Directive 10.7, Inmate Communications, or other subject matter expert, as appropriate.

16. **Treatment of Religious Articles and Items.** All religious articles and religious items, including but not limited to the Holy Bible, the Qur'an, and the Torah, shall be respected by staff and inmates at all times. Religious articles and religious items shall not be carelessly handled by staff when conducting searches or other authorized operational or security activities. Special care shall be taken to respect religious articles and religious items.

    Religious articles and religious items may be confiscated for cause in accordance with Administrative Directive 6.10, Inmate Property. Any questions or concerns regarding any religious article or item shall be referred to the appropriate chaplain and/or other subject matter expert, as appropriate.

    Native American medicine bags shall not normally be handled by staff. In cases where a medicine bag and/or its contents require examination by staff, staff shall instruct the inmate possessing the medicine bag to empty its contents on to a surface for inspection.

17. **Forms and Attachments.** The following forms are applicable to this Administrative Directive and shall be utilized for the intended function:

    A.   CN 100801, Request for Designation of Religion;
    B.   CN 100802, Memorandum of Understanding and Use Agreement for
             Individual Smudging; and,
    C.   Attachment A, Native American Smudging Policy.

18. **Exceptions.** Any exceptions to the procedures in this Administrative Directive shall require prior written approval from the Commissioner.



# Request for Designation of Religion
## Connecticut Department of Correction

CN
100801
REV
6/11/12

| Inmate name: | Inmate number: |
|---|---|

| Facility: | Housing unit: | Date of request: |
|---|---|---|

In accordance with Administrative Directive 10.8, Religious Services, an inmate may participate in collective religious activity with only one religion at a time. *An inmate may designate a change of religion no less than 90 consecutive calendar days from the date that his/her current religious designation became effective, regardless of where the inmate is incarcerated.* An inmate may not participate in collective religious activities with the newly requested religion until he/she has received a signed confirmation notice (attached below) from the Institutional Religious Facilitator or designee.

1.  I,_____ choose the following religion for collective religious activity.

### Circle one religion only

(34) Catholic (Christian) ☐       (46) Protestant (Christian) ☐       (47) Islamic ☐

(24) Jewish ☐       (45) Native American ☐       (23) Jehovah's Witness ☐

- OR -

2.  I choose the following religion, understanding that there is no collective religious activity for this faith group: _____ (specify)

Note: Staff signature below is for Administrative Purposes only and is not a DOC recognition or approval of any group/ body/organization named here as a "religion."

- OR -

3.  I do not wish to choose any religion at this time ☐
**Note: Not selecting a religion is a choice. A selection of no choice shall also be in effect for not less than 90 consecutive calendar days.**

Is this request a change of religion? YES ☐   NO ☐

If "yes," what is your present religion?_____ (specify)

### DO NOT WRITE BELOW THIS LINE — FOR OFFICE USE ONLY

### CONFIRMATION NOTICE FOR CHOICE OF RELIGION

Has it been 90 or more consecutive calendar days since the last request?   YES ☐   NO ☐

Is this request authorized?   YES ☐   NO ☐

If not authorized, explain why:

*Designation forms of newly admitted inmates become effective upon approval of this form by the Institutional Religious Facilitator or designee. A request to change may not be made unless a minimum of 90 consecutive calendar days have elapsed since the inmate's current designation became effective. If fewer than 90 consecutive calendar days have elapsed since the inmate's current designation became effective, the Institutional Religious Facilitator or designee shall return the form to the inmate advising the inmate to resubmit once the 90-day requirement has been fulfilled. All changes shall take effect on the last Monday of the month ONLY following the inmate's written request.*

### Institutional Religious Facilitator/Designee Acknowledgement

| Staff Signature: | Effective date: |
|---|---|

cc:   inmate, inmate master file, institutional religious facilitator



# Memorandum of Understanding and
# Use Agreement for Individual Smudging
## Connecticut Department of Correction

CN 100802
REV 12/5/14

| Inmate name: | Inmate number: |
|---|---|
| Facility/Unit: | Housing unit: |

As a participant in the individual smudging program at: _____
I acknowledge that I understand the following:

1.  I cannot give, lend, or share any smudging materials or items with any other inmate. Any transfer of smudging materials in any way to another inmate is a violation of the smudging policy.

2.  I must purchase all smudging materials and items myself from the commissary, through the Institutional Religious Facilitator. All items not received this way will be rejected.

3.  The only items to be used in smudging are the abalone shell, a turkey feather and the combustible materials purchased from the commissary. The turkey feather may be kept in my cell. Paper towels, pieces of wood, toilet paper etc are not to be used in smudging. Cedar or sage, available through the commissary, are ideal starting materials.

4.  All flammable individual smudging materials must be totally consumed outside during "Smudge Time". Any attempt to bring any flammable materials back into the building is forbidden and will result in disciplinary action.

5.  All provisions of the Religious Services Unit Directive remain in effect.

6.  A feather for smudging one's self may be a substitute prayer format for inmates who are ineligible or unable to smudge in the traditional manner. This can be done in the cell.

7.  I understand that if I wish to smudge on weekends or holidays when the usual support staff is not working, I must advise the housing unit correction officer as early as possible so he/she can contact a shift supervisor.

8.  I understand that all smudging on the days when collective Native American Services are being held shall be during that service only. If Native American Services are canceled, individual smudging will be allowed per this individual smudging agreement.

9.  When smudging, I am allowed to measure out up to one-half ounce (by volume) of smudging material as indicated by the measuring line on the measuring cup that the institution has provided and which is stored with my smudging supplies. In some cases, the Native American Elder or the Institutional Religious Facilitator prepares the smudging materials.

10. Attempting to inhale the smoke, as if smoking a cigarette, is not allowed and is a violation of this smudging agreement. The smoke is to be fanned onto oneself.

11. Any violation of any part of this agreement may result in removal from the individual smudging program for at least six months. If I am removed from the individual smudging program, or change my religion, all my smudging supplies, including shell and feather, will be disposed of according to the provisions of Administrative Directive 6.10, Inmate Property.

12. This agreement expires when I am transferred. By my signature, I acknowledge that I understand all of the above, that it has been verbally explained to me by the staff person who has also signed it, and I have no unanswered questions.

| Inmate signature: | Date: |
|---|---|
| Institutional Religious Facilitator: | Date: |

cc:    inmate, inmate master file, religious services file

# -EXHIBIT-#10

1). Note., AFFIDAVIT BY KEVIN HARRIS

AFFIDAVIT

i Kevin Harris Give this Affidait As
"Absolute" truth:

Captain Kenny lied in his Incident
Report - supplement Page (see Attached Exhibit
#5) - He Knowingly - lied And stated - in that
Report - that it should be Noted that the Prop-
-erty (my property) was Already secured in the
Property Room "Due" to (Me) Inmate Harris Being
in the Restrictive Housing Unit For (my) His in-
-volvement with Recent Assaults, Narcotics, And
Gang Activity in the Facility - When Infact i
was Not in the Restrictive Housing Unit For
Any of that Nor was i Involved in Any of
that... i was in the Restrictive Housing unit
Pending An Investigation For Not locking up
Fast enough During A Code Blue on 8/8/18 At
9:45 A.M. - Which is A Interfering with Safety or
Security Disciplinary Report At the Most And is
that Factual - Disciplinary Report that was Issued
to Me once the Security officer, Major Completed His
Investigation into the Incident - + i was Issued No
Disciplinary Reports of Any Kind, For Assaults,
Narcotics or Gang Activity And was Never Placed in
Restrictive Housing For those thing - or For An Invest-
-igation Pending those things - Captain Kennys Report
was And is An Out Right lie, To Take Focus off His
Actions - Actions He And His officers should Be

My Commission Expires 10/31/24

Notary Public

This 11 day of May 2021

Subscribed and sworn to before me

Held Accountable For, Yes im in PRison For A Crime, But Does that meAn im Not HumAn And SHould Be TReAted like A Dog oR Animal + Be Abuse Physicallf AnD VerhallY?

i Give fou His AffiDAviT UNDER penAltf oF purjurf.

By: Kevin Harris                          on 5/11/2021
       KeviN HARRis #225248
       900 HiGHlAnd Ave.
       CHesHiRe CT. 06410

NotARf: Andrea _____ DAte: 5/11/21
                         10/3/24

PAGe 2 oF 2