# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| KEVIN HARRIS, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. |
| | : | 3:21-cv-703 (CSH) |
| v. | : | |
| | : | |
| KENNY, CAPTAIN; | : | |
| MAJOR, CORRECTIONAL OFFICER; | : | |
| JOHN DOE #1, CORRECTIONAL  OFFICER; | : | |
| JOHN DOE #2, CORRECTIONAL OFFICER; | : | |
| JOHN DOE #3, CORRECTIONAL OFFICER; | : | |
| JOHN DOE #4, CORRECTIONAL OFFICER; | : | |
| JOHN DOE #5, CORRECTIONAL OFFICER; | : | |
| JOHN DOE #6, CORRECTIONAL OFFICER; | : | |
| CARCELLA, WARDEN; | : | |
| MALDANADO, DISTRICT | : | |
| ADMINISTRATOR; | : | |
| SCOTT SEMPLE, COMMISSIONER OF | : | |
| CORRECTION, | : | |
| | : | **SEPTEMBER 15, 2022** |
| Defendants. | : | |
| | : | |
| | : | |

## INIITAL REVIEW ORDER

**HAIGHT, Senior District Judge:**

*Pro se* plaintiff Kevin Harris, currently incarcerated at the Cheshire Correctional Institution ("Cheshire") in Newtown, Connecticut, has filed a Complaint pursuant 42 U.S.C. § 1983 against eleven defendants (herein "Defendants"), all of whom are Connecticut state prison officials and employees who were employed at the Garner Correctional Institution ("Garner") at all relevant

times.[1]  Defendants include Captain Kenny, Correctional Officer Major, Correctional Officer John Does #1 to #6, Warden Corcella, District Administrator Maldonado, and Commissioner Scott Semple.[2]  Each defendant is sued in his individual and official capacity for alleged actions and events at Garner, where Harris was previously housed.  Harris seeks both damages and declaratory relief.

## I.  STANDARD OF REVIEW

Under 28 U.S.C. § 1915A, the Court must review a prisoner's civil complaint seeking redress from a governmental entity, officer, or employee and dismiss any portion that "(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief."  28 U.S.C. § 1915A(b)(1)-(2).  Although highly detailed allegations are not required, the Complaint must "contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'"  *Ashcroft v. Iqbal*,

---

[1] The Court takes judicial notice that following a jury trial, Plaintiff was convicted of murder, Conn. Gen. Stat. §53a-54a, and felony murder, Conn. Gen. Stat.§ 53a-54c, in the September 3, 1993, shooting death of 28-year-old Richard Whipple at a Bristol, Connecticut, housing project.  On January 19, 1996, Plaintiff was sentenced to 60 years, the maximum penalty for his crimes.  *See State v. Harris,* No. CR 9385553, 1999 WL 1001161, at *2 (Conn. Super. Ct. Oct. 26, 1999) (describing sentence and denying application for review in order to protect the public in light of Plaintiff's "propensity for violent and deadly criminal behavior," including "cold-bloodedly sho[oting] the victim through the eye . . . without an apparent reason").

[2] Harris addresses the Defendants by using their positions at the time of the incident(s) underlying this action.  Harris lists Warden "Carcella" as the warden at Garner in the case caption and the list of parties.  He also refers to this defendant as Warden "Corell" in the body of the Complaint. The Department of Correction website indicates that Anthony Corcella was warden at Garner from 2018 to 2019.  Harris also misspells District Administrator Maldonado's name as "Maldanado" and "Maldenado." The Court will use the correct spellings in this Order.

556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  This plausibility standard is not a "probability requirement" but imposes a standard higher than "a sheer possibility that a defendant has acted unlawfully." *Id.*

In reviewing the Complaint, the Court must "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief."  *Faber v. Metro Life Ins. Co*., 648 F.3d 98, 104 (2d Cir. 2011) (citation and internal quotation marks omitted).  *See also Cruz v. Gomez*, 202 F.3d 593, 596 (2d Cir. 2000).  However, the Court is "not bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Faber*, 648 F.3d at 104 (quoting *Rolon v. Henneman,* 517 F.3d 140, 149 (2d Cir. 2008)).  Moreover, "a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  Consequently, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*   (citing *Twombly*, 550 U.S. at 555).  Ultimately, "determining whether a complaint states a plausible claim is context specific, requiring the reviewing court to draw on its experience and common sense." *Id.*  at 663-64 (citing *Twombly*, 550 U.S. at 556).

Dismissal of the complaint is only appropriate if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cruz,* 202 F.3d at 597 (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). "This rule applies with particular force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se*."

*Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir.1998).

With respect to *pro se* litigants, it is well-established that "[p]ro se submissions are reviewed with special solicitude, and 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'" *Matheson v. Deutsche Bank Nat'l Tr. Co.*, 706 F. App'x 24, 26 (2d Cir. 2017) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 3006) (*per curiam*)). *See also Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is 'to be liberally construed,' and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'") (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

This liberal approach, however, does not exempt *pro se* litigants from the minimum pleading requirements described above: a *pro se* complaint still must "state a claim to relief that is plausible on its face." *Mancuso v. Hynes*, 379 F. App'x 60, 61 (2d Cir. 2010) (quoting *Iqbal,* 556 U.S. at 678). Therefore, even in a *pro se* case, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (citation and internal quotation marks omitted). The Court may not "invent factual allegations that [the plaintiff] has not pled." *Id.*

## II.  BACKGROUND

The facts recounted herein are those alleged in the Complaint [Doc. 1]. For purposes of this review, they are accepted as true and all inferences are drawn in the light most favorable to Plaintiff. *Faber*, 648 F.3d at 104; *Cruz*, 202 F.3d at 596.

4

Harris was confined at Garner at all times relevant to this action.[3]   On August 8, 2018, Harris was brought to Captain Kenny's office for questioning after Harris failed to "lock up" and instead "stood around" during a Code Blue (an emergency code for prison riot).     Doc. 1 ("Complaint"), ¶ 16.   During that meeting, Captain Kenny had "two cans of Chemical Agent" within Plaintiff's reach and removed them, stating, "Let me move these before you get a stupid idea." *Id.* ¶ 17.  Harris replied that he was "highly allergic" to chemical agents so would not touch them.  *Id.*  Captain Kenny and Officer Major were dissatisfied with Harris's responses to their questions at the meeting so decided to place Harris in "RHU (Restrictive Housing Unit) pending an investigation." *Id.* ¶ 18.

Captain Kenny, Correctional Officer Major, and Does #1-6 placed Harris in a restrictive housing cell with only a T-shirt for clothing. *Id.* ¶ 19.  When Harris requested underwear and his religious headwear, Correctional Officer Does #1-6 made racial and derogatory responses, calling Harris a "Fake Muslim" and "Suicide Bomber," telling him to "[g]o back to Iraq if [he] want[ed] to play Muslim," reminding Harris that his "Muslim Brothers" got "water boarded" so he should "shut up," and deriding the tassel on his religious headwear as resembling a "Tampon." *Id.* ¶¶ 20-21.  These six Correctional Officers rejected Harris's assertion that he was entitled to wear his religious headwear in restrictive housing and refused his request to speak to a lieutenant. *Id.* ¶ 22.

Correctional Officer Doe #4 refused to give Harris a lunch by order of Captain Kenny. *Id.* ¶ 23.  Harris continued to request lunch, but Doe #4 left the trap door in Harris's cell open while

_____

[3] Harris incorrectly identifies the facility as *Gardner* Correctional Institution.  The Court uses the correct name of Garner.

proceeding to place food trays on the other inmates' trap doors.  *Id.*  Harris heard Doe #4 call Captain Kenny on his radio and inform him that Harris "was yelling to be fed" and "asking for his Religious Head Wear and underwear."  *Id.* ¶ 24.

A few minutes later, Harris heard a door open and someone running.  *Id.* ¶ 25.  Captain Kenny appeared, inserted his arm through the trap door of Harris's cell, sprayed him with a chemical agent, and told him to "[s]hut up."  *Id.*  Harris asked Captain Kenny, "Why did you spray me [;] you know I'm allergic to Chemical Agent."  *Id.* ¶ 26.  Captain Kenny continued spraying Harris and ordered him to approach the door to be handcuffed.  *Id.*  Harris complied. *Id.*

The Defendants then walked Harris to a shower and placed him under the water for "a few seconds," all the while keeping him handcuffed so that he was not allowed to use his hands to wash the chemical agent off his body.  *Id.* ¶ 27.  Harris was placed in full in-cell restraints.  *Id.* ¶ 29.  Thereafter, he suffered an allergic reaction to the chemical agent.  His breathing became difficult "to the point [where he] had to be rushed to [an] outside Hospitol [sic]" by ambulance and placed on oxygen.  *Id.* ¶ 29.  Due to his allergic reaction, Harris was ultimately given an injection and some cream to apply to the lining of his eyelids to enable him to see.  *Id.*

Soon after this incident, Harris complained to Warden Corcella and, on August 24, 2018, filed a grievance.  *Id.* ¶ 30.  On August 28, 2018, Harris was removed from his cell in the RHU and taken to meet with a Connecticut state trooper named Bell (Badge #354).  *Id.* ¶ 31.  The trooper told Harris that his property had been searched that day and cocaine had been found in his sneakers ("Grey Jordans").  *Id.*  The trooper told Harris that he had received a report from Captain Kenny, indicating that Harris was involved in "recent assaults, narcotics and gang activity in the [prison] facility."  *Id.* ¶ 32.  Harris responded by saying that the report was "a lie."  *Id.*  When asked why

6

prison officials would lie, Harris told the state trooper that the prison staff did not like "the fact that [he had] won some rights for a disruptive group" called the "Nation of Gods and Earth," which was then recognized by the Department of Correction ("DOC") as an off shoot of the "Muslim Nation." *Id.* ¶ 33.

Furthermore, Harris told the trooper that the white powder in his sneakers was actually foot powder. *Id.* ¶ 34. He then noted sarcastically that although he had been in restrictive housing since August 8, 2018, his cell had been searched and cocaine had allegedly been discovered only four days after he had complained to the warden and filed a grievance (on August 24, 2018). *Id.* The trooper took the white powder as evidence and told Harris that it would be sent to a lab for analysis pursuant to the DOC "Fentanyl Policy." *Id*. ¶ 35. The lab results, and any resulting charges, would then be sent to Garner. *Id.*

On February 28, 2020, Harris's family contacted the state police and learned that the powder was "cleared" – *i.e.,* not drugs. *Id.* ¶ 36. Harris was never notified of the test results and his sneakers were "not returned to [him] promptly." *Id.*

## III.   DISCUSSION

In his Complaint, Harris asserts six claims: (1) Captain Kenny violated the Eighth Amendment by using "excessive force" when he sprayed Harris with a chemical agent on August 8, 2018, Doc. 1, ¶ 39; (2) Captain Kenny, Correctional Officer Major, and Does #1-6 violated the Eighth Amendment by using "excessive force" when they placed Harris in full in-cell restraints on August 8, 2018, *id.* ¶ 40; (3) supervisors Corcella, Maldonado, and Semple violated the Eighth Amendment – inflicting unconstitutional pain, suffering, physical injury, and emotional distress – by failing to correct the misconduct of Kenny and the Correctional Officers, *id.* ¶ 41; (4) all

7

Defendants were deliberately indifferent to Harris's serious medical needs in violation of the Eighth Amendment, *id.* ¶ 42; (5) all Defendants violated Harris's First Amendment rights to practice his religion by denying him the right to wear his religious headwear, *id.* ¶ 43; and (6) Captain Kenny and Correctional Officer Major violated the First Amendment by unlawfully retaliating against Harris for filing the August 24, 2018, grievance by Kenny making a false report to the state police (regarding assaults, narcotics, and gang activity) and Major searching Harris's property, *id.* ¶ 44.

**A. Claims One and Two:  Excessive Force in Violation of Eighth Amendment**

Harris asserts two claims for use of "excessive force" on August 8, 2018: one claim against Captain Kenny for spraying Harris with a chemical agent and a second claim against Captain Kenny, Correctional Officer Major, and Does #1-6 for Harris's confinement in full in-cell restraints.

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments," U.S. Const. amend. VIII, which includes the "unnecessary and wanton infliction of pain," G*regg v. Georgia*, 428 U.S. 153, 173 (1976). To state a claim for the use of excessive force in violation of the Eighth Amendment, the plaintiff must allege facts establishing both objective and subjective components. *See Sims v. Artuz*, 230 F.3d 14, 20-21 (2d Cir. 2000).

The objective component "focuses on the harm done" to the prisoner in light of "contemporary standards of decency;" and the amount of harm "depends on the nature of the claim."  *Id.* at 21 (citing *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).  Although some degree of injury is usually required, the prisoner need not show that he suffered a "significant injury" to state a claim for use of excessive force.  *See Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). "[T]he use of

8

excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury." *Id.* at 34 (quoting *Hudson*, 503 U.S. at 4). However, "not 'every malevolent touch by a prison guard gives rise to a federal cause of action.'" *Id.* at 37 (quoting *Hudson*, 503 U.S. at 9).

The subjective component of the "excessive force" standard requires a showing that the use of force was "carried out 'maliciously and sadistically' rather than as part of 'a good faith effort to maintain or restore discipline.'" *Id.* at 40 (quoting *Hudson*, 503 U.S. at 9). The courts must consider whether "the officials act[ed] with a sufficiently culpable state of mind." *Hudson*, 503 U.S. at 8 (citation omitted).

The extent of the inmate's injuries is one factor the court may use to determine whether correctional staff could "plausibly" have considered the force necessary in a particular situation. *Id.* at 7. Other factors include "the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Id.* (citation and internal quotation marks omitted).

In the case at bar, Harris alleges that Captain Kenny deployed a chemical agent to subdue him even though Harris had told him that day that he was severely allergic to chemical agents and Harris's medical records confirmed the existence of that allergy. Doc. 1, ¶¶ 17, 25-26, 28-29; *id.* at 12-19 (Ex. 2). Harris also alleges that without assessing his behavior in his RHU cell, Captain Kenny ran in and immediately deployed the chemical agent in response to Officer Doe #4's statement that Harris was yelling about his meal, underwear, and religious headwear. *Id.* ¶¶ 24-25. Given these circumstances — alleged purposeful, impulsive deployment of a chemical agent

9

to an inmate with a known chemical allergy — for purposes of this review, Plaintiff alleges sufficient facts to state a plausible claim for use of "excessive force" with respect to Captain Kenny's deployment of the chemical agent on August 8, 2018.  Further development of the record will be required to properly evaluate the claim.

As to the second "excessive force" claim, application of restraints, Harris simply alleges that Captain Kenny, Correctional Officer Major, and Does #1-6 placed him in full in-cell restraints when he was being removed from his RHU cell and "not acting disruptively" on August 8, 2018. *Id*. ¶ 40.  He provides no information as to the length of time he remained in said restraints and/or whether he suffered any resulting physical injuries.  However, because Harris alleges that he was taken to the hospital shortly after being restrained, it appears that his time in full restraints was relatively short.  *Id.* ¶ 29. Absent any alleged injury and given the limited time period of restraint, the Defendants' use of force appears to be *de minimis* and fails to satisfy the objective component of the "excessive force" test.  Therefore, the "excessive force" claim for placement in restraints will be dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

## B.  Claim Three:  Failure to Supervise against Corcella, Maldonado, and Semple

At all relevant times, Defendants Corcella, Maldonado, and Semple were supervisory officials at Garner.  Plaintiff alleges that these supervisors are liable for their failure to correct, and/or their encouragement of, the misconduct of the other Defendants in this action. Doc. 1, ¶ 41. These supervisors cannot be held liable simply due to their positions.

The Second Circuit recently clarified the standard to be applied to a claim of supervisory liability in *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020).  Prior to the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Second Circuit identified "five categories

10

of evidence that [could] establish the liability of a supervisory official for a subordinate's conduct under [42 U.S.C.] § 1983." *Tangreti*, 983 F.3d at 616 (citation omitted).  Two of these categories involved creation of an unconstitutional policy and/or the failure to act on unconstitutional acts. *Id.*  In *Iqbal,* however, the Supreme Court rejected vicarious supervisor liability, mandating that "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* (quoting *Iqbal*, 556 U.S. at 676).  Therefore, a supervisor could not be "held liable based on a lesser showing of culpability than the constitutional violation requires."  *Id.* at 617 (quoting *Iqbal,* 556 U.S. at 677) (internal quotation marks omitted).

In *Tangreti*, the Second Circuit held that, "after *Iqbal*, there is no special rule for supervisory liability." *Id.* at 618.  A plaintiff must plead and prove that the governmental-official defendant violated the Constitution through his own actions.  *Id.* (citing *Iqbal*, 556 U.S. at 676).  Thus, Harris must plead and prove that each supervisory defendant was personally aware of and disregarded the alleged constitutional violations.

In his Complaint, Harris alleges no facts to demonstrate that any supervisory official was personally aware of the alleged unconstitutional acts by subordinates (*e.g.,* spraying of a chemical agent, using restraints, making false misbehavior reports).  He alleges only that he "complained to [Warden Corcella]" and filed a grievance on August 24, 2018, following the alleged chemical spray incident of August 8, 2018.  Doc. 1, ¶ 30.  Moreover, Harris alleges no facts to suggest that Defendants Maldonado and Semple had any knowledge of what occurred on August 8.  The response to Harris's grievance included a handwritten notation that "[t]his matter may be appealed to:  D[istrict] A[dministrator] Maldonado;" but Harris never indicated that he made such an appeal.

11

*Id.* at 21.

Furthermore, even if these three supervisory defendants had been aware of the August 8 events, "[a] supervisor's 'mere knowledge . . .' is not sufficient because that knowledge does not 'amount[] to the supervisor's violating the Constitution.'" *Tangreti*, 983 F.3d at 616-17 (quoting *Iqbal*, 556 U.S. at 677)); *see also Lopez v. Chappius*, No. 6:17-CV-06305 (EAW), 2021 WL 859384, at *2 (W.D.N.Y. Mar. 8, 2021) ("mere receipt of communications from Plaintiff" held insufficient to show supervisors' personal involvement in alleged constitutional violation because "[e]ven before *Tangreti,* it was well-established that a supervisor's failure to respond to a letter of complaint does not provide a sufficient basis to find that the defendant was personally involved in the deprivation alleged") (citation and internal quotation marks omitted).

In the case at bar, Harris alleges no facts to prove the involvement of supervisors Corcella, Maldonado, and Semple in the alleged constitutional violations.   The fact that they were supervisors at Garner is insufficient to hold them liable for the alleged unconstitutional acts of their subordinates.   Harris's claim for failure to supervise against these Defendants will be dismissed for failure to state a claim pursuant to 28 U.S.C. § 1915A(b)(1).

## C.  Claim Four:  Deliberate Indifference to Serious Medical Needs

Harris generally alleges that all Defendants were deliberately indifferent to his serious medical needs.  The Court surmises that this claim relates to the use of the chemical agent on August 8, 2018, which triggered his allergic reaction.

The Eighth Amendment forbids "deliberate indifference" to prisoners' serious medical needs.  *Spavone v. New York State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013).  To state a claim for said deliberate indifference, a plaintiff must demonstrate both that his need was

serious, and the defendant acted with a sufficiently culpable state of mind. *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). Accordingly, there are both objective and subjective prongs embodied in the "deliberate indifference" standard.

Objectively, the alleged deprivation must be "sufficiently serious," such that the condition is one "of urgency, . . . that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (citation omitted). "This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006). Furthermore, a medical condition which is not initially serious may become so because it is degenerative. In other words, if left untreated or neglected for a long period of time, the condition may "result in further significant injury or the unnecessary and wanton infliction of pain." *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000) (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)). Therefore, "a decision to leave a condition untreated will be constitutional or not depending on the facts of the particular case." *Id.* at 136–37.

The Second Circuit has identified several factors that are "highly relevant to the inquiry into whether a given medical condition is a serious one." *Chance*, 143 F.3d at 703. For example, courts examine whether the injury is one that "a reasonable doctor or patient would find important and worthy of comment or treatment;" if the condition "significantly affects an individual's daily activities;" and/or whether there exists "chronic and substantial pain." *Id.* at 702 (citation and internal quotation marks omitted).

With respect to the subjective prong, the "charged officials must be subjectively reckless in their denial of medical care." *Spavone*, 719 F.3d at 138 (citing *Salahuddin*, 467 F.3d at 280).

13

They must have been "*actually aware* of a substantial risk that serious inmate harm will result" due to their actions or inactions.  *Id.* (emphasis in original).  They must know of the risk to the inmate's health and safety – be "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994). However, the officials need "not intend harm[;] [a]nd awareness may be proven 'from the very fact that the risk was obvious.'"  *Spavone*, 719 F.3d at 138 (quoting *Farmer*, 511 U.S. at 842).

Negligence that would support a claim for medical malpractice does not rise to the level of deliberate indifference and is not cognizable under section 1983. *Salahuddin,* 467 F.3d at 280-81. The official's actions must be "more than merely negligent." *Id.* at 280.  "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . .be condemned as the infliction of punishment."  *Farmer*, 511 U.S. at 838.  Such failure does not constitute deliberate indifference.

Nor does a disagreement over the treatment provided show deliberate indifference.  *Wright v. Rao,* 622 F. App'x 46, 47 (2d Cir. 2015) (citing *Chance*, 143 F.3d at 703). "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim." *Chance,* 143 F.3d at 703.  "So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Id.  See also Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) ("It has long been the rule that a prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment …. [T]he essential test is one of medical necessity and not one simply of desirability.") (citation and internal quotation marks omitted).

In the present case, Harris has demonstrated that he told Captain Kenny and Correctional Officer Major of his allergy to chemical agents during the meeting on August 8, 2018.  Doc. 1, ¶¶ 17-18.  That allergy was also documented in Harris's medical records prior to August 8, 2018.  *Id.* at 12-19, Ex. 2 ("Physician's Orders," indicating "drug allergies/hypersensitivities" dating back to 10/13/2016).  Nonetheless, when he believed that Harris was being disruptive in the RHU on that day, Kenny quickly sprayed Harris with a chemical agent, causing him to suffer significant difficulty in breathing, resulting in his being taken to the hospital by ambulance and "put on oxygen tanks." *Id.* ¶¶ 25-29.  Due to his allergic reaction, Harris was given an injection at the hospital and eye cream to treat the lining of his eye lids for a week or two to enable him to see.  *Id.* ¶ 29.  In light of the severity of Harris's reaction to the chemical agent, the Court finds, solely for purposes of initial review, that he possessed a serious medical need with respect to his allergy.

To state a cognizable section 1983 claim, however, Harris must also allege facts demonstrating the personal involvement of each defendant in the alleged constitutional violation.  *Costello v. City of Burlington*, 632 F.3d 41, 49 (2d Cir. 2011) (citing *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)).  For his "deliberate indifference" claim, Harris must show that each defendant was aware of and disregarded a substantial risk that Harris would suffer serious harm if the chemical agent was deployed.

As discussed *supra*, Harris alleges that he told Captain Kenny about his allergy on August 8, 2018, but Captain Kenny deployed the chemical agent on that date anyway.  Doc. 1, ¶¶17, 25-26, 28.  Correctional Officer Major was present when Harris told Captain Kenny about his allergy, *id.* ¶ 17; and Major was also present when Harris showered but did not allow Harris to use his hands to decontaminate himself, *id.* ¶ 27.

15

In contrast, with respect to Correctional Officer Does #1-6, Harris makes no allegations to establish that they were aware of his chemical agent allergy.[4] Although his allergy was documented in his medical records, Harris does not show that these Does had access to or reviewed said records.  Harris has thus failed to demonstrate that the Does had actual knowledge of the substantial risk of harm from his chemical allergy.

In sum, Plaintiff has established an objectively serious medical condition, his allergy to chemical agents.  Upon review of the alleged facts regarding the subjective component, the deliberate indifference claim will proceed against Captain Kenny and Correctional Officer Major. Both had knowledge of the allergy on August 8, 2018, and participated in deployment and/or inadequate decontamination measures with respect to the chemical agent.  However, the claim will be dismissed against Correctional Officer Does #1-6, whose awareness of the allergy, if any, has not been shown.

**D.  Claim Five: Interference with Free Exercise of Religion under First Amendment**

Harris contends that the Defendants violated his First Amendment right to freely practice his religion by denying him his religious headwear. Doc. 1, ¶¶ 22, 43. The First Amendment Free Exercise Clause requires that government officials respect, and avoid interference with, the religious beliefs and practices of the people.  *See Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005). Prisoners "retain some measure of the constitutional protection afforded by the First Amendment's

---

[4] The Court notes that Plaintiff has also pled no facts to establish that the supervisor Defendants (Corcella, Maldonado, and Semple) were aware of his chemical agent allergy.  All claims against these supervisors will be dismissed, as discussed *supra*, Pt. III.B.

Free Exercise Clause." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (citation omitted). Prisoners' constitutional rights, however, are balanced against legitimate penological objectives. *Id. See also Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006) (Government action challenged under the Free Exercise Clause "passes constitutional muster if it is reasonably related to legitimate penological interests.") (citation and internal quotation marks omitted).

To state a First Amendment "free exercise" claim, a prisoner must make a threshold showing that "the disputed conduct substantially burden[ed] his sincerely held religious beliefs." *Salahuddin*, 467 F.3d at 274-75. He must allege facts showing that he sincerely holds a particular belief, that the belief is religious in nature, and that the challenged action substantially burdened his exercise of that belief. *See Ford*, 352 F.3d at 588-91. A belief is substantially burdened "where the state 'puts substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Forde v. Zickefoose*, 612 F. Supp. 2d 171, 177 (D. Conn. 2009) (quoting *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996)). In considering whether a prisoner has made the required showing, the court does not "evaluate the objective reasonableness of the prisoner's belief" but considers only whether the prisoner "sincerely holds a particular belief and whether the belief is religious in nature." *Ford*, 352 F.3d at 590 (quoting *Jolly*, 76 F.3d at 476).

The Second Circuit has noted that the application of the threshold showing has not been definitively decided in this Circuit and has been questioned "in light of the Supreme Court's statement in *Employment Division v. Smith*[, 494 U.S. 872, 887 (1990),] that application of the test embroils courts in 'the unacceptable business of evaluating the relative merits of differing religious claims.'" *Holland v. Goord*, 758 F.3d 215, 220–21 (2d Cir. 2014) (citing *Ford*, 352 F.3d at 592 and quoting *Emp't Div.*, 494 U.S. at 887). *See also Williams v. Does*, 639 F. App'x 55, 56 (2d Cir.

17

2016) ("We have not yet decided whether a prisoner asserting a free-exercise claim must, as a threshold requirement, show that the disputed conduct substantially burdened his sincerely held religious beliefs.").  However, absent clear guidance rejecting the threshold requirement, district courts within this Circuit continue to apply the substantial burden test when addressing free exercise claims.  *See, e.g., Baltas v. Jones*, No. 3:21CV469 (MPS), 2021 WL 6125643, at *11 (D. Conn. Dec. 27, 2021) (applying substantial burden test); *Jones v. Annucci,* No. 16-CV-2516(KMK), 2018 WL 910594, at *13 (S.D.N.Y. Feb. 14, 2018) (same).

In the present case, Harris alleges that he was denied his religious headwear.  He does not, however, allege that this action substantially burdened a sincerely held religious belief.  Indeed, other than alleging that the Defendants called him a Muslim and that he was a proponent of "The Nation of Gods and Earth," Doc. 1, ¶¶ 20-21, 33, Harris does not identify his religion or any particular religious beliefs.  As the Complaint is devoid of facts suggesting how Defendants' failure to provide his headwear violated his First Amendment right, Harris's free exercise claim is dismissed without prejudice.  Harris may, if so advised, file an amended complaint to reassert this claim *if* he can allege facts to demonstrate that failure to wear a particular head covering substantially burdened a sincerely held religious belief.

### E. Claim Six:  First Amendment Retaliation for Filing Grievance

Harris alleges that Defendants Major and Kenny violated his First Amendment right to seek redress through the prison grievance system when they retaliated against him for filing a grievance on August 24, 2018, regarding the spraying of chemical agent on August 8, 2018. Doc. 1, ¶¶ 44-45.  It is well established that "retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and

18

Fourteenth Amendments and is actionable under § 1983." *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir.1996).  To state a cognizable First Amendment retaliation claim, Harris must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Burns v. Martuscello*, 890 F.3d 77, 84 (2d Cir. 2018) (quoting *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015)).

Regarding the requisite elements, the Second Circuit has "instructed district courts to approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official — even those otherwise not rising to the level of a constitutional violation — can be characterized as a constitutionally proscribed retaliatory act." *Dolan*, 794 F.3d at 295 (citation and internal quotation marks omitted). For this reason, a prisoner's First Amendment retaliation claim must "be supported by specific and detailed factual allegations, not stated in wholly conclusory terms." *Id.* (citation and internal quotation marks omitted).

In the case at bar, with respect to protected speech, "[t]here is no serious question that, for pleading purposes, [a prisoner] alleges protected activity" when he asserts he filed "a complaint . . . or internal grievances." *Smith v. Maypes-Rhynders*, No. 07 CIV.11241 (PAC) (MHD), 2009 WL 874439, at *4 (S.D.N.Y. Mar. 31, 2009) (citing *Gill v. Pidlypchak*, 389 F.3d 379, 381, 383-84 (2d Cir. 2004) (treating the filing of prison grievances as protected First Amendment activity)). *See also Graham*, 89 F.3d at 80 (filing a prison grievance is protected activity; the "right to petition government for the redress of grievances" is constitutionally guaranteed).

Next, with respect to "adverse action," such action must have been sufficiently serious to

"deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights" to speech. *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (citation omitted). "Otherwise, the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir. 2001).[5] This objective inquiry regarding the "adverse action" "is not static across contexts," but "must be tailored to the different circumstances in which retaliation claims arise." *Id.* (citation omitted). "Prisoners may be required to tolerate more than public employees . . . before a retaliatory action taken against them is considered adverse." *Id.* (citation and internal brackets omitted).

Finally, the conduct of filing the grievance must be "a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (citing *Gayle v. Gonyea*, 313 F.3d 677 (2d Cir.2002)). There must be a causal link between the protective speech of the grievance and the adverse action.

In the case at bar, on August 24, 2018, Harris filed a grievance regarding the events of August 8, 2018, complaining that he was sprayed with a chemical agent. Doc. 1, at 21 (Ex.3, "Administrative Remedies Form"). Such an alleged grievance may be characterized as "protected" speech.

As to adverse action by defendant prison officials, Harris alleges that shortly after he filed his grievance, Correctional Officer Major searched his personal property and found a cocaine-like powder in Harris's sneakers, his "Grey Jordans."[6] Doc. 1, ¶ 31. "While the Second Circuit has

---

[5] *Overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

[6] According to an "Incident Report" by Captain Kenny, dated August 27, 2018, Officer

not decided whether a cell search can constitute an adverse action, many district courts within the circuit have held that it cannot." *Williams v. King*, 56 F. Supp. 3d 308, 327–28 (S.D.N.Y. 2014).[7] At present, "neither the United States Supreme Court nor the Second Circuit has ever held that a cell search can be the basis of a First Amendment retaliation claim." *Jones v. Harris*, 665 F. Supp. 2d 384, 398 (S.D.N.Y. 2009) (holding correctional officer "would be entitled to qualified immunity on a claim of First Amendment retaliation relating to the cell searches, since it is not well-settled that cell searches can be the subject of a First Amendment retaliation"). *See also Trapani v. Dagostino*, No. 918-CV-0805 (DNH)(CFH), 2019 WL 5149795, at *13 (N.D.N.Y. June 10, 2019) ("It is well settled that retaliatory cell searches are not actionable under § 1983.") (collecting cases).

With respect to searching prisoners' property, "[c]orrectional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities." *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington,* 566 U.S. 318, 328 (2012) (citation omitted). "[C]ourts have upheld many regulations designed to prevent the introduction of contraband into correctional facilities, even when imposing significant costs to inmate dignity."

---

Major decided to "conduct a thorough inspection of inmate Harris['s] property," which had "already [been] secured in the Property Room" due to Harris's location in the RHU. Doc. 1, at 34 ("Incident Report" by Kenny, 8/28/2018). As explained by Officer Major, the search was part of a general "shakedown in Alpha unit," and Harris's property was being searched due to the "amount" of said property stored and Harris's "recent involvement" with another inmate (whose name was redacted) and "the class A Contraband (Suboxone) on 8/13/18." *Id.* at 36 ("Incident Report" by Major, 10/9/2018).

[7] *Order clarified*, 56 F. Supp. 3d 389 (S.D.N.Y. 2014), *aff'd in part, vacated in part*, 679 F. App'x 86 (2d Cir. 2017), and *aff'd*, 679 F. App'x 86 (2d Cir. 2017).

*Vann v. Fischer*, No. 11 CIV. 1958 KPF, 2014 WL 4188077, at *12 (S.D.N.Y. Aug. 25, 2014). For example, the United States Supreme Court has permitted "suspicionless searches of inmate cells and lockers." *Id.* (citing *Hudson v. Palmer*, 468 U.S. 517 (1984)). Although "there is a risk of maliciously motivated searches, . . . [t]he uncertainty that attends random searches of cells renders these searches perhaps the most effective weapon of the prison administrator in the constant fight against the proliferation of knives and guns, illicit drugs, and other contraband." *Hudson,* 468 U.S. at 528. "[W]holly random searches are essential to the effective security of penal institutions." *Id.* at 539.

Moreover, although "alleged planting of evidence" and resulting "disproportionate administrative actions" may be "serious enough to constitute adverse actions" in the First Amendment context, *Williams*, 56 F. Supp. 3d at 328, there is no evidence that Major planted any evidence. In fact, the lab later "cleared" the white powdery substance found in Harris's shoes as "not" a drug. Doc. 1, ¶ 36. There was also no "unwarranted confiscation of non-contraband personal property" in this case. *Cf. Funches v. Russo*, No. 917CV1292LEKDJS, 2018 WL 6381058, at *4 (N.D.N.Y. Dec. 6, 2018). There is no evidence that Plaintiff lost his sneakers permanently. He alleged only that his sneakers were not "promptly" returned. Doc. 1, ¶ 36. Under these circumstances, Major's search of Harris's property was not "adverse" for purposes of a First Amendment claim.

In addition to the search of Harris's property by Major, Captain Kenny allegedly provided a false report to State Trooper Bell, indicating that Harris was involved with "recent assaults, narcotics, and gang activity" in the prison. *Id.* ¶ 32. A false misbehavior report may be sufficiently "adverse" to meet the second element of a retaliation claim. *See Boddie v. Schneider*, 105 F.3d

857, 862 (2d Cir. 1997) (false misbehavior report issued in retaliation for exercising constitutional right is actionable); *Mateo v. Fischer*, 682 F. Supp. 2d 423, 435 (S.D.N.Y. 2010) (same).

Furthermore, with respect to timing and motive, Harris alleges that Kenny's "false report" was given to the state trooper on or before August 28, 2018, only four days after Harris filed his grievance.  Doc. 1, ¶¶ 31, 44. "[T]emporal proximity of an allegedly retaliatory misbehavior report to a grievance may serve as circumstantial evidence of retaliation." *Gayle v. Gonyea*, 313 F.3d 677, 683 (2d Cir. 2002) (citing *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).  *Accord Washington v. Afify*, 681 F. App'x 43, 46 (2d Cir. 2017); *Mateo*, 682 F. Supp. 2d at 435.

In sum, examining the alleged facts in the light most favorable to Plaintiff, accepting for the present that Captain Kenny's report was untrue, Harris has alleged a plausible claim for First Amendment retaliation against Captain Kenny for issuing a false report approximately four days after Harris submitted his August 24, 2018, grievance. In contrast, the claim may not proceed against Correctional Officer Major because searching Harris's property was not an "adverse action" for purposes of First Amendment retaliation.

## F.  Official Capacity Claims

Harris brings this action against all Defendants in their individual and official capacities. For relief, he seeks damages and a declaration that Defendants violated his rights.  The Eleventh Amendment prohibits an award of money damages against state officials in their official capacities unless the state has waived this immunity or Congress has abrogated it. *Kentucky v. Graham*, 473 U.S. 159, 169 (1985); *Quern v. Jordan*, 440 U.S. 332, 342 (1979).  Section 1983 does not abrogate state sovereign immunity, *Quern*, 440 U.S. at 343; and Harris alleges no facts suggesting that the state of Connecticut has waived immunity in this case.  Because each Defendant is an official of

the state of Connecticut, the state's sovereign immunity forecloses Harris from proceeding against them in their official capacities to the extent that he seeks an award of money damages.

## G.  Declaratory Relief

As to declaratory relief, Plaintiff cannot obtain such relief in this action.  Declaratory relief serves to "settle legal rights and remove uncertainty and insecurity from legal relationships without awaiting a violation of the rights or a disturbance of the relationship."  *Colabella v. Am. Inst. of Certified Pub. Accts.,* No. 10-CV-2291 (KAM) (ALC), 2011 WL 4532132, at *22 (E.D.N.Y. Sept. 28, 2011) (citation omitted).  As such, "[d]eclaratory relief operates *prospectively* to enable parties to adjudicate claims before either side suffers great damages." *Orr v. Waterbury Police Dep't*, No. 3:17-CV-788 (VAB), 2018 WL 780218, at *7 (D. Conn. Feb. 8, 2018) (emphasis added).  In *Orr*, the court dismissed the request for declaratory judgment that the defendants had violated the plaintiff's Fourth Amendment rights during his arrest because the request "concern[ed] only past actions."  *Id.*  As Harris seeks declaratory relief based on past actions, his request for declaratory relief will be dismissed.

Furthermore, Harris alleges that all Defendants were employed at Garner during the relevant period described in the Complaint.  Since then, according to his address of record on the case docket, Harris was transferred from Garner to Cheshire.  Therefore, his requests for declaratory relief are also barred based on his transfer. In the Second Circuit, "an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility."  *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) (collecting cases).  For this reason, Harris's request for declaratory relief is moot.

## IV. ORDERS

The Eighth Amendment "excessive force" claim against Captain Kenny, Correctional Officer Major, and Does #1-6 with respect to the use of full in-cell restraints on August 8, 2018; the "failure to supervise" claims against Corcella, Maldonado, and Semple; the Eighth Amendment claim for "deliberate indifference" to serious medical needs against Correctional Officer Does #1-6; the First Amendment retaliation claim against Correctional Officer Major for the search of Harris's property; all claims for damages against the Defendants in their official capacities; and Harris's request for declaratory relief are DISMISSED pursuant to 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

The First Amendment "free exercise" claim against all Defendants is dismissed without prejudice to Harris filing an amended complaint to reassert this claim if he can allege facts showing that denial of his religious headwear by specified defendant(s) substantially burdened a sincerely held religious belief. Any amended complaint shall be filed on or before **October 6, 2022**, and shall include the three claims for which service has been ordered below.

The case will proceed exclusively on the following **three claims**: Eighth Amendment "excessive force" against Captain Kenny for the use of the chemical agent on August 8, 2018; Eighth Amendment "deliberate indifference to serious medical needs" against Captain Kenny and Correctional Officer Major with respect to Plaintiff's chemical agent allergy; and First Amendment "retaliation" against Captain Kenny for issuance of a "false" misconduct report after Plaintiff filed a grievance on August 24, 2018.

Defendants Corcella, Maldonado, Semple, and Correctional Officer Does #1-6 are hereby TERMINATED as Defendants in this action. There are no claims remaining against them.

The Court enters the following additional orders.

(1)     **The Clerk shall** verify the current work addresses for Defendants Kenny and Major with the Department of Correction Office of Legal Affairs, mail a waiver of service of process request packet containing the Complaint and this Order to each such Defendant at the address provided within **twenty-one (21) days** of this Order, and report to the Court on the status of the waiver request on the thirty-fifth day after mailing.  If either Defendant fails to return the waiver request, the Clerk shall make arrangements for in-person service by the U.S. Marshals Service on that Defendant in his individual capacity and the Defendant shall be required to pay the cost of such service.

(2)     T**he Clerk shall** send the Plaintiff a copy of this Order.

(3)     **The Clerk shall** send a courtesy copy of the Complaint and this Order to the Connecticut Attorney General and the Department of Correction Office of Legal Affairs.

(4)     The Defendants shall file their response to the Complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the waiver forms are sent.  If they choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claim recited above.  They also may include all additional defenses permitted by the Federal Rules.

(5)     Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed within **seven months (210 days)** from the date of this Order.  Discovery requests need not be filed with the Court.

(6)     All motions for summary judgment shall be filed within **eight months (240 days)** from the date of this Order.

(7)     Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within twenty-one (21) days of the date the motion was filed.  If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(8)     If the Plaintiff changes his address at any time during the litigation of this case, Local Civil Rule 83.1(c)2 provides that he MUST notify the Court.  Failure to do so can result in the dismissal of the case.  The Plaintiff must give notice of a new address even if he is incarcerated. The Plaintiff should write "PLEASE NOTE MY NEW ADDRESS" on the notice.  It is not enough to simply include the new address on a letter without indicating that it is a new address.  If the Plaintiff has more than one pending case, he should indicate all case numbers in the notification of change of address.  The Plaintiff should also notify the Defendants, or the attorney for the Defendants, of his new address.

(9)     The Plaintiff shall utilize the Prisoner E-filing Program when filing documents with the Court.  The Plaintiff is advised that the Program may be used only to file documents with the Court. As the District's Local Civil Rules provide that discovery requests are not filed with the Court, discovery requests must be served on Defendants' counsel by regular mail.

(10)    The Clerk shall immediately enter the District of Connecticut Standing Order Re: Initial Discovery Disclosures concerning cases initiated by self-represented inmates and shall send a copy to the Plaintiff.

It is **SO ORDERED.**

**Dated:**  New Haven, Connecticut
        September 15, 2022

                    */s/Charles S. Haight, Jr.*
                    CHARLES S. HAIGHT, JR.
                    Senior United States District Judge

27